667 F.2d 267
 109 L.R.R.M. (BNA) 2098
 LOCAL 1814, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,
AFL-CIO, Political Action and Education Fund, on behalf of
itself and certain contributors and Local 1814,
International Longshoremen's Association, AFL-CIO, on behalf
of some of its members, Plaintiffs-Appellants-Cross-Appellees,
v.
The WATERFRONT COMMISSION OF NEW YORK HARBOR,
Defendant-Appellee-Cross-Appellant.
and
New York Shipping Association, Inc., Defendant-Appellee.
 Nos. 1683, 1710.
Dockets 81-7351, 81-7371.
 United States Court of Appeals,
Second Circuit.
 Argued July 17, 1981.
Decided Dec. 15, 1981.
 
 James M. Altman, New York City (Schulman & Abarbanel, New York City, on the brief), for plaintiffs-appellants-cross-appellees.
 David B. Greenfield, New York City (Gerald P. Lally, Rosemary Orr, Robert A. Pin, New York City, on the brief), for defendant-appellee-cross-appellant.
 Before VAN GRAAFEILAND and NEWMAN, Circuit Judges, and DUMBAULD,* District Judge.
 NEWMAN, Circuit Judge:
 
 
 1
 Plaintiffs, a labor union and its political action committee, seek to enjoin the defendant Waterfront Commission from enforcing a subpoena issued in connection with an investigation into whether longshoremen were being coerced into authorizing payroll deductions for contributions to the political action committee. The subpoena, issued to the longshoremen's employer who administers the payroll deduction system, seeks the disclosure of the names of those longshoremen who have recently authorized the payroll deductions. Plaintiffs claim that such disclosure would infringe the First Amendment rights of contributors. The District Court for the Southern District of New York (Charles L. Brieant, Judge) permitted enforcement of the subpoena after modifying it to permit the disclosure on a random basis of only 10% of the names that the Commission sought. Plaintiffs appeal, contending that even this disclosure of a limited number of names violates the contributors' First Amendment rights. The Commission cross-appeals, contending that the District Court should not have modified its subpoena and should have permitted it to compel disclosure of all the names of longshoremen that it had requested. We affirm the District Court's decision to permit enforcement of the subpoena as modified.
 
 
 2
 The Waterfront Commission was created by interstate compact between New York and New Jersey for the purpose of investigating and helping to eliminate corruption on the waterfront in the Port of New York. Local 1814 of the International Longshoremen's Association, AFL-CIO, is the largest local labor organization representing longshoremen working in the New York Harbor area. The Local currently has approximately 4,000 longshoremen members.
 
 
 3
 Over ten years ago Local 1814 created a political committee, currently known as "Local 1814, Longshoremen's Association, AFL-CIO, Political Action and Education Fund" (the Fund), which makes contributions and expenditures in connection with federal and state elections. In December 1978, Local 1814 began seeking from its members authorizations to make their contributions to the Fund by payroll deduction. Pursuant to agreement with the New York Shipping Association, Inc. (NYSA), the multi-employer bargaining association that negotiates and administers Local 1814's collective bargaining agreement, 1/4 of one percent of the gross earnings of those longshoremen signing authorization forms would be deducted from the longshoremen's wages and forwarded to the Fund. The payroll deduction system went into operation on January 1, 1979; by that date approximately 2,900 longshoremen had signed the payroll deduction authorization forms. 450 more signed after that date. Only 650 of Local 1814's approximately 4,000 longshoremen members have not authorized payroll deductions for Fund contributions.
 
 
 4
 When the Waterfront Commission heard reports that longshoremen were being subjected to economic coercion to sign the authorization forms, it commenced an investigation. The Commission became aware of complaints of coercion by eight longshoremen. Three different individuals were identified as alleged coercers. Some of the complainants reported that longshoremen seeking economic benefits from the union were led to believe that authorization of the payroll deductions would "facilitate" receipt of the benefits.
 
 
 5
 The Waterfront Commission decided to expand the investigation to ascertain the extent of the coercive practices. To avoid the time and expense of questioning all 4,000 longshoremen members, the Commission issued a subpoena to NYSA, which, as amended by the Commission, seeks to compel the disclosure of the names of the approximately 450 longshoremen who signed payroll deduction authorizations after January 1, 1979. The Commission believed that these longshoremen were those most likely to have encountered coercive practices because their delay in authorizing the deduction after the deduction plan was first announced indicated less enthusiasm for authorizing the contributions. In addition, some of these longshoremen may have authorized the deduction only when they were allegedly told that they needed to do so in order to receive certain benefits or cooperation from the union. Furthermore, most of the instances of coercion that the Commission had uncovered were alleged to have taken place after January 1, 1979.
 
 
 6
 Local 1814 and the Fund brought suit against the Waterfront Commission and NYSA on behalf of their members and contributors. Plaintiffs sought to enjoin the enforcement of the subpoena, contending that disclosure of the contributors' names by defendant NYSA to the Commission would result in an unconstitutional chilling effect upon the union members' political and associational First Amendment rights. The District Court, in an opinion reported at 512 F.Supp. 781, found that issuance of the subpoena was within the Commission's statutory authority. The District Court then found that disclosure was likely to have a chilling effect on the exercise of union members' First Amendment rights. But the District Court also found that disclosure was reasonably related to the compelling state interest in fighting crime on the waterfront. In recognition of the difficulty of balancing these competing interests, the District Court suggested that counsel attempt to agree on a procedure for an investigation that would lessen the impact on First Amendment rights without compromising the Commission's legitimate investigative needs. When counsel could not agree on such a procedure, the District Court entered a judgment modifying the subpoena to allow the Commission to obtain the names of only 45 randomly selected longshoremen of the 450 who had authorized payroll deductions to the Fund after January 1, 1979. This Court stayed enforcement of the modified subpoena pending this appeal.
 
 
 7
 The Fund's standing to assert the First and Fourteenth Amendment rights of association and privacy of its individual members is beyond dispute. NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458-60, 78 S.Ct. 1163, 1169-70, 2 L.Ed.2d 1488 (1958). To force the individual longshoremen contributors to assert their own rights of anonymity would defeat the purpose of the litigation, the Fund is for all practical purposes identical to its individual members that use it as a medium to effectuate the expression of their views, and the Fund would be adversely affected by the disclosure's alleged chilling effect. Id. at 459-60, 78 S.Ct. at 1170. Because a determination that Local 1814 lacked standing would not avoid resolution of any of the issues in this case, we assume without deciding that Local 1814 also has standing to sue. See California Bankers Ass'n v. Shultz, 416 U.S. 21, 44-45, 94 S.Ct. 1494, 1509, 39 L.Ed.2d 812 (1974).
 
 
 8
 The First and Fourteenth Amendments protect the longshoremen's "freedom to engage in association for the advancement of beliefs and ideas," NAACP v. Alabama, supra, 357 U.S. at 460, 78 S.Ct. at 1160, and the right to contribute money to the fund to promote their common political beliefs. Buckley v. Valeo, 424 U.S. 1, 65-66, 96 S.Ct. 612, 656-657, 46 L.Ed.2d 659 (1976); California Bankers Ass'n v. Shultz, supra, 416 U.S. at 78-79, 94 S.Ct. at 1525-1526 (Powell, J., concurring); Bates v. City of Little Rock, 361 U.S. 516, 518, 80 S.Ct. 412, 414, 4 L.Ed.2d 480 (1960); Pollard v. Roberts, 283 F.Supp. 248 (E.D.Ark.) (three-judge court), aff'd per curiam, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). Disclosure of the identities of a group's members or contributors may have the practical effect of discouraging the exercise of these constitutionally protected rights. NAACP v. Alabama, supra, 357 U.S. at 462, 78 S.Ct. at 1171. As a result, governmental attempts to compel such disclosures have been subjected to exacting scrutiny. Buckley v. Valeo, supra, 424 U.S. at 64-74, 96 S.Ct. at 656-661; Gibson v. Florida Legislative Investigation Committee, 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Bates v. City of Little Rock, supra; NAACP v. Alabama, supra; Pollard v. Roberts, supra; cf. Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960) (disclosure of identities of anonymous pamphleteers). Compelled disclosure is not permitted unless it is substantially related to a compelling governmental interest. Buckley v. Valeo, supra, 424 U.S. at 64, 96 S.Ct. at 656; Communist Party of the United States v. Subversive Activities Control Board, 367 U.S. 1, 92-103, 81 S.Ct. 1357, 1408-1414, 6 L.Ed.2d 625 (1961); In re Rabbinical Seminary Netzach Israel Ramailis, 450 F.Supp. 1078 (E.D.N.Y.1978).
 
 
 9
 Here the government-compelled disclosure is directed at a third party, NYSA, rather than directly at the Fund or Local 1814. But First Amendment rights are implicated whenever government seeks from third parties records of actions that play an integral part in facilitating an association's normal arrangements for obtaining members or contributions. For example, in Pollard v. Roberts, supra, the Republican Party of Arkansas secured protection against efforts by the State of Arkansas to obtain from a bank records that would have identified the Party's contributors. See United States v. Citizens State Bank, 612 F.2d 1091 (8th Cir. 1980); cf. United States v. Miller, 425 U.S. 435, 444 n.6, 96 S.Ct. 1619, 1624 n.6, 48 L.Ed.2d 71 (1976); California Bankers Ass'n v. Shultz, supra, 416 U.S. at 56 n.26, 94 S.Ct. at 1515 n.26; United States Servicemen's Fund v. Eastland, 488 F.2d 1252, 1261 (D.C.Cir.1973), rev'd on other grounds, 421 U.S. 491 & 501 n.14, 95 S.Ct. 1813 & 1820 n.14, 44 L.Ed.2d 324 (1975); but see Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co., 593 F.2d 1030, 1055 n.82 (D.C.Cir.1978) (opinion of Wilkey, J.), cert. denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979). In this case, though an employer's payroll-deduction system is not as critical to political action fund raising as a bank's check-negotiating services, the payroll-deduction mechanism administered by NYSA plays an integral role in facilitating the First Amendment rights of longshoremen to contribute to the Fund. We therefore deem the NYSA records entitled to the same protection available to records of the Fund.
 
 
 10
 The Commission contends that no impairment of protected rights has been established because of the absence of any showing that disclosure of contributors' identities would lead to economic or physical harassment or other manifestation of public hostility against rank-and-file members. This case, the Commission suggests, is unlike NAACP, Bates, and Gibson, where the Supreme Court found that the asserted governmental interests would not justify the chilling of First Amendment rights; the Court relied on well-known acts of public hostility directed toward the NAACP in southern states during the 1950's and 1960's. See also Buckley v. Valeo, supra, 424 U.S. at 68-72, 96 S.Ct. at 658-660; Marshall v. J.P. Stevens Employees Education Committee, 495 F.Supp. 553 (E.D.N.C.1980) (antiunion group), aff'd in part and vacated in part sub nom. Marshall v. Stevens People & Friends for Freedom, 92 Lab.Cas. P 12,944 (4th Cir. 1981); Doe v. Martin, 404 F.Supp. 753 (D.D.C.1975) (three-judge court) (Socialist Workers Party).
 
 
 11
 However, a factual record of past harassment is not the only situation in which courts have upheld a First Amendment right of non-disclosure. The underlying inquiry must always be whether a compelling governmental interest justifies any governmental action that has "the practical effect 'of discouraging' the exercise of constitutionally protected political rights," NAACP v. Alabama, supra, 357 U.S. at 461, 78 S.Ct. at 1171, "even if any deterrent effect ... arises ... as an unintended but inevitable result of the government's conduct in requiring disclosure," Buckley v. Valeo, supra, 424 U.S. at 65, 96 S.Ct. at 656. Thus, in Pollard v. Roberts, supra, although there was no evidence of past reprisals against contributors to the Republican Party of Arkansas, the court held that it would be "naive" not to recognize that disclosure would impermissibly discourage the exercise of constitutional rights given the unpopularity of the Republican Party of Arkansas at that time. 283 F.Supp. at 258, aff'd per curiam, 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968). In Shelton v. Tucker, supra, the Supreme Court struck down a state law requiring the teachers of Arkansas to disclose all organizations to which they belonged as violative of the Fourteenth Amendment. As in Pollard the Court adopted a commonsense approach and recognized that a chilling effect was inevitable if teachers who served at the absolute will of school boards had to disclose to the government all organizations to which they belonged. "(T) he pressure upon a teacher to avoid any ties which might displease those who control his professional destiny would be constant and heavy." 364 U.S. at 486, 81 S.Ct. at 251. See also Talley v. California, supra (ordinance requiring names and addresses on all distributed handbills declared unconstitutional because of obvious tendency to restrict freedom of expression); United States v. Citizens State Bank, supra (alleged adverse effect on organizational and fundraising activities of group opposed to current operation of IRS from IRS summons seeking group's bank records implicates First Amendment associational right); Community-Service Broadcasting of Mid-America, Inc. v. FCC, 593 F.2d 1102, 1118 (D.C.Cir.1978) (en banc) (opinion of Wright, C.J., joined by Wilkey, J.) (court's task to evaluate likelihood of chilling effect even in the absence of concrete evidence); Developments in the Law-Elections, 88 Harv.L.Rev. 1111, 1248-50 (1975).
 
 
 12
 We believe that compelled disclosure of the Fund's contributors under the circumstances of this case would give rise to a chilling effect similar to the one recognized by the Supreme Court in Shelton v. Tucker, supra. The Waterfront Commission has undeniably broad powers of control over waterfront labor. It has the responsibility of supervising the hiring and assignment of all longshoremen. The Commission has the power to cause longshoremen to lose their jobs by removing or suspending them from the longshoremen's register. N.Y.Unconsol.Laws §§ 9827, 9831, 9913 (McKinney 1974). Refusal to answer questions or produce evidence in a Commission investigation may be grounds for revocation or suspension from the register. Id. § 9913(5). The Commission's pervasive control over the economic livelihood of longshoremen is analogous to the control over the professional destiny of Arkansas teachers wielded by school boards in Shelton v. Tucker, supra. We agree with the District Court that there is a substantial danger that longshoremen will perceive a connection between contributing to the Fund and being called before the all-powerful Commission. Some chilling effect on some contributors would be inevitable.
 
 
 13
 Whether that chilling effect is an unconstitutional impairment of non-disclosure rights depends on an assessment of the weight of the asserted governmental interest and the degree of impairment of protected rights. There is little doubt that the Waterfront Commission has a compelling governmental interest in fighting crime on the waterfront. Cf. Branzburg v. Hayes, 408 U.S. 665, 700-01, 92 S.Ct. 2646, 2666, 33 L.Ed.2d 626 (1972). More specifically, there is an undoubted compelling governmental interest in preventing the extraction of money from longshoremen by coercive means, especially when the alleged method of coercion involves abdication of a union's statutory duty of fair representation of all of its members. Pursuit of the compelling governmental interest in rooting out the coercion of political contributions protects the First Amendment right to contribute to the groups of one's choice. "For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and conscience rather than coerced...." Abood v. Detroit Board of Education, 431 U.S. 209, 234-35, 97 S.Ct. 1782, 1799, 52 L.Ed.2d 261 (1977). Coerced contributions can be as violative of First Amendment values as abridgment of the right to contribute. Id. at 235-36, 97 S.Ct. at 1799-80.
 
 
 14
 The Commission has adduced a sufficient factual predicate to establish that its proposed action bears a significant relationship to the important government interest of fighting economic coercion on the Waterfront. The Commission's investigation has uncovered eight instances of alleged coercion. Three complainants have testified under oath in detail about their personal encounters with attempts to coerce their authorization of the payroll deduction. There is evidence that union economic benefits have been used as the bait for contributions. Furthermore, the names that the Commission seeks are those that are likely to enable it most expeditiously to discover the extent and form of coercion on the waterfront. Longshoremen who waited until after January 1, 1979 before signing the payroll deduction authorizations are more likely to have been unenthusiastic about contributing. These longshoremen may have succumbed to coercion in return for full enjoyment of union benefits. Much of the Commission's evidence pointed to coercion occurring after January 1, 1979. The Commission has thus adduced sufficient evidence of coercive practices to demonstrate that disclosure of the names of recent contributors will likely advance the asserted governmental interest in rooting out economic coercion on the waterfront.
 
 
 15
 This is not a case where the compelled disclosure is sought on the basis of "mere suspicion" that the information sought will lead to evidence of violation of the law. Pollard v. Roberts, supra, 283 F.Supp. at 257-58. In Pollard, the Prosecuting Attorney sought disclosure of the names of contributors to the Arkansas Republican Party in his investigation of whether votes were bought in an election. But the basis for the investigation was the existence of checks drawn in small amounts for the rendering of campaign services such as knocking on doors and ringing door bells. Id. at 252. On the basis of such a limited showing there was little reason to believe that disclosure would lead to evidence of vote buying. Under such circumstances disclosure was not reasonably related to a compelling governmental interest. Id. at 256-57. See also Gibson v. Florida Legislative Investigation Committee, supra, 372 U.S. at 551, 554-58, 83 S.Ct. at 897-99; Bates v. City of Little Rock, supra, 361 U.S. at 524-27, 80 S.Ct. at 417-18; NAACP v. Alabama, supra, 357 U.S. at 463-66, 78 S.Ct. at 1172-73.
 
 
 16
 Our determination that disclosure is significantly related to the achievement of a compelling governmental interest does not end our inquiry, however, for we must still examine the scope of the proposed action. "(E)ven though the governmental purpose (assuring teacher competence) be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved." Shelton v. Tucker, supra, 364 U.S. at 488, 81 S.Ct. at 252. In Shelton, the fatal defect in the requirement that all teachers disclose all organizational relationships was the "unlimited and indiscriminate sweep" of the requirement. Id. at 487-88, 490, 81 S.Ct. at 251-52, 253. See also Talley v. California, supra, 362 U.S. at 64, 80 S.Ct. at 538; Pollard v. Roberts, supra, 283 F.Supp. at 257. Normally, judicial scrutiny of the scope of governmental impairments assesses the nature and degree of the impairment, rather than solely the number of people subject to the proposed action. E.g., Martin v. City of Struthers, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); Thornhill v. Alabama, 310 U.S. 88, 97-98, 60 S.Ct. 736, 741-742, 84 L.Ed. 1093 (1940); Schneider v. State, 308 U.S. 147, 161-65, 60 S.Ct. 146, 150-52, 84 L.Ed. 155 (1939); see Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969). But we think it is appropriate in determining whether the governmental interest justifies the inevitable chilling effect of some disclosures to assess whether the disclosures will impact a group properly limited in number in light of the governmental objective to be achieved. The Commission has made a substantial effort to narrow the focus of its subpoena by directing it only at those who authorized the payroll deductions after January 1, 1979, a group more likely than the membership as a whole to have experienced coercion. But we agree with Judge Brieant that, at this stage, disclosure of all 450 names of these contributors would sweep unnecessarily beyond the Commission's legitimate needs. We approve the District Court's modification of the subpoena to permit disclosure on a random basis of only 10% (45) of the longshoremen who signed authorization forms after January 1, 1979. The 45 names should provide the Commission with a sufficient basis to initiate an inquiry among contributors and will appropriately limit the impairment of longshoremen's First Amendment rights without compromising the Commission's legitimate investigative needs.[1]
 
 
 17
 Whether the Commission would be entitled to subpoena names beyond the initial group of 45 will be a matter for further inquiry by the District Court if the Commission reasserts such authority after the testimony of the first 45 contributors. At that time, the balance of governmental interest against further impairment may be affected on both sides: there may well be an indication as to whether questioning of contributors secures evidence of coercion and whether the disclosure of some contributors has a chilling effect upon others. Based on initial results, the Commission will also be in a position to assess whether further inquiry should be directed at a random cross-section of both non-contributors and recent contributors, since the 16% of the membership (650 longshoremen) who have not contributed may also be useful sources of information about coercion. Indeed, two of the Commission's complainants are non-contributors who successfully resisted whatever coercion may have occurred. Focusing on both of these groups would still concentrate on those longshoremen likely to have experienced coercion (1,100 of the 4,000 longshoremen) without excessively burdening contributors' First Amendment rights. In short, the balance in the future will not necessarily be the same as the balance that we conclude was correctly struck by the District Court in limiting the subpoena to 45 names and permitting it to be enforced.
 
 
 18
 Judgment affirmed. The stay is vacated, and the mandate shall issue forthwith.
 
 
 19
 DUMBAULD, District Judge, sitting by designation, concurring:
 
 
 20
 I concur in the Court's judgment but would go further and permit enforcement of the subpoena without the 10% limitation imposed by the District Court.
 
 
 21
 A constitutional right to make voluntary political contributions is not chilled or discouraged by determining whether political contributions of union members made through a check-off system were in fact voluntary or not.
 
 
 
 *
 The Honorable Edward Dumbauld of the United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 We reject plaintiffs' contention that the Commission could use equally effective means to conduct its investigation that would not infringe upon First Amendment rights. Interviews of those contributors whose names are already public because of the requirements of state and federal disclosure laws would not be equally effective. The disclosure laws, 2 U.S.C. § 432 (1976); N.Y.Elec.Law § 14-102 (McKinney 1978), required disclosure of the identity of longshoremen who contributed $100 or more to the Fund. Because these individuals are among the most successful wage earners on the docks (1/4 of one percent of their gross earnings exceed.$99) they are more likely to have voluntarily contributed to the Fund. Questioning the alleged coercers is not likely to be a fruitful source of information. Publicizing the Commission's investigation has already been tried, and hoping for volunteered information is not likely to be as effective as Commission examination of known contributors