The FRIENDS SOCIAL CLUB, et al., Plaintiffs,

v.

SECRETARY OF LABOR, Defendant.

Civ. A. No. 89–CV–72559–DT.

United States District Court, E.D. Michigan, S.D.

May 13, 1991.

William M. Mazey, Southfield, Mich., for plaintiffs.

Peter Caplan, U.S. Atty., James R. Streicker, Chicago, Ill., for defendant.

## OPINION AND ORDER ACCEPTING MAGISTRATE'S REPORT AND RECOMMENDATION AND ORDERING PLAINTIFFS TO COMPLY WITH DEPARTMENT OF LABOR SUBPOENAS

ROSEN, District Judge.

Presently before the Court is the May 31, 1990 Report and Recommendation of Magistrate Judge Virginia M. Morgan wherein she recommends that the Court dismiss the Plaintiffs' claim for declaratory and injunctive relief and grant the Defendant Secretary's counterclaim to enforce the administrative subpoenas issued by the Secretary. The Court held a hearing on May 3, 1991, at which time the Court heard the arguments of counsel respecting the Plaintiffs' objections to the Report and Recommendation. After considering these arguments and the record in this case, the Court is persuaded that the Magistrate Judge's Report and Recommendation should be adopted and the subpoenas ordered enforced.

FACTS AND BACKGROUND:

The events pertinent to the instant case unfold against a background of internal conflict within the International Union of the United Automobile, Aerospace and Agricultural Workers of America (International UAW). The conflict is between members of the union who are affiliated with the Administration Caucus, on the one hand, and those who are affiliated with the New Directions Caucus, on the other hand. These two factions are equivalent to political parties within the UAW. *Brock v. International Union, U.A.W.*, 682 F.Supp. 1415, 1418 n. 2 (E.D.Mich.1988), *aff'd*, 889 F.2d 685 (6th Cir.1989), *reh. den., en banc.* The Administration Caucus has been in ex-

istence since at least 1958. (Affidavit of Carl Tillery, Par. 6, p. 2). In contrast, the New Directions Caucus was formed in 1985 by some UAW members who were "dissatisfied with their union's leadership." *Tucker v. Bieber,* 900 F.2d 973, 975 (6th Cir.1990), *cert. den.,* —— U.S. ——, 111 S.Ct. 135, 112 L.Ed.2d 102 (1990).

Jerry Brock is a member of the New Directions Caucus and, in May, 1986, announced his candidacy for the office of Regional Director of the union's Region 5, which election was scheduled to take place in June, 1986. Jerry Brock lost the election to the then incumbent Regional Director of Region 5, Ken Worley. Brock then filed various complaints with the U.S. Department of Labor, alleging, among other things, that Worley's use of office stationery, typewriters and facilities to further his individual campaign violated Section 401(g) of the Labor Management Reporting and Disclosure Act of 1959, 29 U.S.C. § 481(g).

As a result of Brock's complaint, the Secretary of Labor filed a civil action in this Court to compel the Union to rerun the election with Department of Labor supervision. Upon the parties' cross motions for summary judgment, this Court's predecessor, the Honorable Richard F. Suhrheinrich, granted the Secretary's motion for summary judgment and ordered the election to be rerun.

Judge Suhrheinrich's opinion provides further insight into the relationship between the two competing caucuses, their individual candidates for Regional Director, and union leadership:

On June 4, 1986, local UAW ... delegates elected from the ranks of the locals met to elect the UAW Region 5 Regional Director. Pursuant to the UAW Constitution, Region 5 is composed of Missouri, Arkansas, Louisiana, Kansas, Oklahoma, Texas, Colorado, and New Mexico.... This election is of great significance in the UAW since the Region 5 Regional Director not only runs Region 5, but also is part of the UAW's International Executive Board (hereinafter IEB). The IEB is the governing body of the UAW, and is currently composed of the UAW president, the secretary-treasurer, 5 vice presidents, and 16 regional directors elected from the UAW's 10 regions....

Two candidates were running for the office of Region 5 Regional Director in the 1986 election. These individuals were Ken Worley, the incumbent Regional Director, and Jerry Tucker, a former Worley assistant who had been a UAW International Representative for 16 years. Tucker was the Assistant Regional Director for Region 5, having been appointed to this position by Ken Worley. Tucker held his job, the highest appointed position in Region 5, until a month before the election when he was fired. Notably, while Worley was supported by the Administration Caucus, Tucker was supported by the New Directions Caucus. *All of the incumbent UAW directors and elected officers were members of the Administration Caucus.*

Tucker declared his candidacy for the regional director position on May 8, 1986. By so declaring his candidacy, Tucker acted in contravention to a policy ... requiring appointed UAW staff members who oppose an elected incumbent to declare their candidacy at least 90 days before the election and to take an unpaid leave of absence from their staff position for that length of time. Although Tucker asked for a leave of absence after he declared, the leave was denied him. He was instead discharged from his staff position at UAW President Owen Bieber's behest on May 12, 1986. The stated reason for Tucker's termination was his violation of the 90–day rule.

Due to his discharge, Tucker was denied access to the floor of the convention. Thus, he was unable to campaign for office at the convention. Additionally, the fact of his discharge was common knowledge among the delegates. However, Tucker was not prohibited from running for union office.

The Region 5 Regional Director election took place at the 1986 UAW convention in Anaheim, California. Many of the Region 5 delegates were dressed in grey jackets which had a map of the region

and the words "Ken Worley, Director" emblazoned on the back. Jerry Tucker's supporters wore blue jackets to distinguish themselves from the other Region 5 delegates. Since these jackets are at issue in one of the present cases, a historical note is appropriate. The wearing of jackets has become common at UAW conventions during the past 20 years. These jackets are generally in different colors for the different UAW regions and are used to supply regional identity to the delegates. The regional director's name apparently does not appear on some.[1]

The vote for Region 5 Regional Director was taken in roll call fashion, with the delegates from each local being polled separately. After the votes were tallied, UAW officials declared Ken Worley the winner by a total of 324.577 votes to Tucker's 324.416 votes. On the basis of this count, Worley won by 0.161 of one vote.

*Brock*, 682 F.Supp., at 1417–1418 (emphasis added).

The election for Regional Director of Region 5 was rerun on September 2, 1988. This time, Tucker defeated Worley by a substantial margin, and he was certified as regional director. However, his term as Regional Director expired in 1989. On June 21, 1989, the next regular election was held, and Tucker lost the election to Roy Wyse, a member of the Administration Caucus. *Brock*, 889 F.2d, at 689. Roy Wyse has held the office since that time, and the next election will be held in 1992.

Subsequently, on November 3, 1989, the Court of Appeals dismissed as moot the appeals relating to the District Court's order requiring the election to be rerun, as well as the Secretary's challenge to the union's determination that certain retired UAW members would be ineligible to vote in the rerun elections. *Id.* (The appeal was moot because the 1989 regular election intervened before the issues relating to the 1986 and 1988 elections could be decided by

the Court of Appeals.) In a separate opinion, the Court of Appeals affirmed Judge Suhrheinrich's dismissal of Tucker's civil action, in which he had claimed that his dismissal from his appointed position as Assistant Regional Director (for the stated reason that he violated the 90–day rule in announcing his candidacy only one month before the election) constituted breach of contract. *See Tucker v. Bieber*, 900 F.2d 973 (6th Cir.1990).

On July 10, 1989, Tucker filed a complaint with the Office of Labor–Management Standards Enforcement, U.S. Department of Labor, alleging various violations of Section 401 of the Labor–Management Reporting and Disclosure Act, 29 U.S.C. § 481, in relation to the June, 1989 election in which he was defeated by Roy Wyse. (Exhibit 1 to Secretary of Labor's Brief in Response to Objections to Magistrate's Report and Recommendation.) Tucker challenged the results of the June, 1989 election and requested a Department of Labor-supervised rerun election.

In the complaint, Tucker alleged that the local union elections to select the delegates to attend the June, 1989 convention/election were all tainted by the use of union members' coerced contributions to the Friends Social Club Fund (one of the Plaintiffs in this case) to fund the Administration Caucus' campaign in the Region 5 election, including expenses for campaign literature, living and travel expenses for Roy Wyse, the Administration Caucus' candidate for Region 5 Regional Director (who took an unpaid leave of absence six months prior to the election), living and travel expenses for others who campaigned on behalf of the Administration Caucus, and various campaign-related social functions for retired UAW members. He explicitly alleged that the coercive solicitations for contributions to the Friends Social Club Fund were made to union members outside of Region 5. (Exhibit 1 to Secretary's Brief, pp. 9–10).

---

**1.** During the convention, UAW president Owen Bieber wore a "Worley" jacket on the convention podium, while conducting UAW business, as an act of campaigning for Worley. *Brock*, 682 F.Supp., at 1429 n. 16.

Tucker further alleged that, at the June, 1989 convention, campaign literature supporting the Administration Caucus' candidates was distributed to delegates by union employees during union time, and also as part of their registration materials. (Exhibit 1, p. 13). He alleged these campaign materials were prepared by union workers, on union time, and at union expense. (Exhibit 1, p. 14). In addition, Tucker raised various claims arising from the local unions' refusal to recognize the votes from various retired UAW members.

Tucker's complaint further alleged that the union interfered with his duties as Regional Director subsequent to the election by refusing to allow him to appoint his own Assistant Regional Director (instead installing Roy Wyse, a member of the Administration Caucus and, later, Tucker's successful challenger in the 1989 election).

The Department of Labor has since commenced an investigation of Tucker's complaint. As part of that investigation, the Secretary has subpoenaed documents and financial records of the Plaintiff flower funds,[2] not only with respect to Region 5, but nationwide. The parties agree that the requested documents would disclose the names of individual contributors to the various flower funds and, consequently, disclose their affiliation with the Administration Caucus.

The Plaintiffs commenced this action to quash the Department of Labor's subpoenas, on the grounds that the disclosures required by the subpoenas would violate the First Amendment right of association of the Plaintiffs' members and contributors. The Secretary's counterclaim requests a judgment enforcing and ordering the Plaintiffs to comply with the subpoenas.

The claims were referred to Magistrate Judge Virginia Morgan for her Report and Recommendation. The Court agrees with, and will adopt, the Report and Recommendation. The purpose of this opinion is to address the arguments raised by the parties in their oral arguments before this Court and in the objections to the Report and Recommendation.

DISCUSSION:

A. *Relevancy Objections*

■ The Plaintiffs raise essentially two discreet objections to the Report and Recommendation. First, the Plaintiffs argue that the subpoenas are overbroad and seek irrelevant information. The subpoenas were issued by the Secretary to investigate whether the Plaintiff "flower funds" were unlawfully operated and funded by incumbent officers and employees of Region 5 of the International Union, UAW, to finance the officers' union campaign activities and whether these officers and employees improperly coerced contributions to the various flower funds from union staff members, local unions, and employers.

The Plaintiffs argue that the subpoenas are overbroad in that they seek information regarding UAW-related flower funds not only from Region 5, where the improprieties are alleged to have been concentrated, but from all over the country. The Plaintiffs further argue that the subpoenas are overbroad to the extent that the subpoenas seek "any and all records" of the flower funds rather than just those records which are related to the Region 5 elections.

■ The Plaintiffs' overbreadth argument is not well founded. The investigative subpoena power of the Department of Labor is equal to the subpoena power of the federal grand jury. *Dole v. Trinity Industries, Inc.*, 904 F.2d 867, 872 (3d Cir. 1990), *cert. den.*, — U.S. ——, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990) (citing *United States v. Morton Salt Co.*, 338 U.S. 632, 70 S.Ct. 357, 364, 94 L.Ed. 401 (1950). In *United States v. R. Enterprises, Inc.*, — U.S. ——, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991), the Supreme Court held that the subpoena power of the federal grand jury is not to be interpreted narrowly, encompassing only relevant, admissible, and specific evidence. Instead, the Supreme Court

---

**2.** "Flower funds" are ostensibly private groups which collect wholly voluntary contributions from UAW members and employees and make donations to various charitable, educational, social, and other causes, as well as to partisan union political activities.

held that "where, as here, a subpoena is challenged on relevancy grounds, the motion to quash must be denied unless the district court determines that there is no reasonable possibility that the category of materials the Government seeks will produce information relevant to the general subject of the grand jury's investigation." *Id.*, 111 S.Ct., at 728. In reaching this conclusion, the Supreme Court noted that the grand jury's function is not to determine whether a particular defendant is guilty of a particular crime, as is the case with the trial jury. Rather, the grand jury has a much broader, investigative function to determine not only whether the law has been violated but to satisfy itself that no offense has occurred. *Id.*, at 726. *See also Morton Salt, supra,* 338 U.S., at 652, 70 S.Ct., at 369 ("Even if one were to regard the request for information in this case as caused by nothing more than official curiosity, nevertheless law-enforcing agencies have a legitimate right to satisfy themselves that corporate behavior is consistent with the law and the public interest."). Because, "the identity of the offender, and the precise nature of the offense, if there be one, normally are developed at the conclusion of the grand jury's labors, not at the beginning," the grand jury's subpoena powers cannot be subjected to relevance objections the same as a trial court's subpoena powers could. *R. Enterprises,* 111 S.Ct., at 726. "Any holding that would saddle a grand jury with minitrials and preliminary showings would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *Id.*, at 727. *See also University of Pennsylvania v. E.E.O.C.,* 493 U.S. 182, 110 S.Ct. 577, 584–585, 107 L.Ed.2d 571 (1990) (requiring a specific reason for disclosure would improperly impair investigative functions of Equal Employment Opportunity Commission).

While the Secretary's current investigation arises from a private complaint that the Plaintiff flower funds were improperly intertwined with officers and employees of UAW Region 5, the Plaintiffs do not suggest that the Secretary's power to investigate is limited to Region 5. Moreover, Tucker's complaint itself specifically alleges that the contributions to the flower funds that were used to finance the Administration Caucus' activities in Region 5 were coerced from union members inside and outside of Region 5. Thus, the Department's complete investigation of the complaint requires it to investigate contributions from outside Region 5.[3] Because the Court cannot conclude that there is "no reasonable possibility" that the category of records sought by the Secretary "will produce information relevant to the general subject" of the Secretary's investigation, the Court cannot deny enforcement on relevancy grounds. *R. Enterprises,* 111 S.Ct., at 728. *See also Trinity Industries,* 904 F.2d, at 872 (Secretary of Labor's subpoena is valid if it is relevant to *"some* (any) inquiry that the Secretary is authorized to undertake"—not just the subject matter of the pending complaint).

The Court is satisfied that the scope of the Secretary's subpoena is within the Secretary's investigative authority and therefore enforceable.

■ The Plaintiffs further argue that they should not be compelled to comply with the subpoenas because they have submitted affidavits showing that the flower funds were not involved in any unlawful activities. However, this sort of "blanket denial" and "self-serving assertion" does not constitute grounds to deny enforcement of the subpoenas; the Secretary is instead entitled to satisfy herself that no laws have been violated. *See R. Enterprises,* 111 S.Ct., at 729.

3. Moreover, the affidavit of Mary Ann Campbell, the assigned investigator from the Office of Labor–Management Standards, United States Department of Labor, states that the Secretary's investigation is concerned with the "overall relationship between the subject funds and the official union structure as well [as] the legality of that relationship. The apparent flow of funds strongly suggests that the problem is nation wide [sic] in scope requiring review of fund records from all regions." (Campbell Affidavit, Par. 5, p. 3).

■ Finally, the Plaintiffs suggest that, because the enforcement of the subpoenas impinges upon the First Amendment freedom of association rights of the members and contributors to the flower funds, the Court should require the Secretary to use the least restrictive means possible to investigate Tucker's complaint. *See Local 1814, Intern. Longshoremen's Ass'n, AFL–CIO v. Waterfront Comm'n of New York Harbor,* 667 F.2d 267 (2d Cir.1981). The Plaintiffs argue that, if the Court orders them to produce any documents in response to the subpoenas, they should first be ordered to produce only those records related to the flower funds activities in Region 5. Then, only if these records sustain an apparent violation, the Secretary can subsequently seek a order requiring the Plaintiffs to turn over records relating to the other regions.

In *Local 1814,* the New York Waterfront Commission subpoenaed the names of 450 contributors to the political action fund set up by Local 1814. The contributors were members of the local union who had signed authorization forms allowing their contributions to be deducted from their payroll. As in the instant case, the Waterfront Commission issued the subpoenas to investigate complaints that the local union was coercing "voluntary" contributions to the fund. The local union filed an action in the district court to enjoin enforcement of the subpoenas on the grounds that the First Amendment freedom of association rights of its members would be violated if it were forced to disclose the names of members who had made contributions to the funds.

After agreeing with the district court below that the subpoenas would have an "inevitable" chilling effect on the members exercise of their First Amendment rights, the Second Circuit Court of Appeals went on to analyze "whether the disclosures will impact a group properly limited in number in light of the governmental objective to be achieved." *Id.,* at 273. The *Local 1814* court noted:

> The Commission has made a substantial effort to narrow the focus of its subpoena by directing it only at those who authorized the payroll deductions after January 1, 1979, a group more likely than the membership as a whole to have experienced coercion. But we agree with Judge Brieant that, at this stage, disclosure of all 450 names of these contributors would sweep unnecessarily beyond the Commission's legitimate needs. We approve the District Court's modification of the subpoena to permit disclosure *on a random basis* of only 10% (45) of the longshoremen who signed authorization forms after January 1, 1979. The 45 names should provide the Commission with a sufficient basis to initiate an inquiry among contributors and will appropriately limit the impairment of longshoremen's First Amendment rights without compromising the Commission's legitimate investigative needs.

*Id.,* at 273–274 (emphasis added).

This Court finds that the approach taken by the courts in *Local 1814* undermines important and legitimate governmental investigatory objectives, and, absent any indication that the Sixth Circuit Court of Appeals would adopt the analysis of *Local 1814,* the Court respectfully declines to follow it. First, it does not appear to this Court that requiring an investigation to be conducted "on a random basis" can be done "without compromising the Commission's legitimate investigative needs." Although the probabilities may be debatable, it is certainly possible that "random" investigation of only 10% of the contributions may not reveal wrongdoing that is actually taking place. Where there is a basis for belief that wrongdoing has occurred, the government cannot be limited in its investigation to an artificial "pin-the-tail-on-the donkey" procedure.

Second, the notion that a random investigation of contributors would have less of a "chilling" effect on the contributors' First Amendment rights is doubtful. Supposing that the sampling could truly be conducted on a purely random basis, *any* contributor would henceforth be put on notice that his private associations could be ordered disclosed. That such compelled disclosure would be done randomly would provide lit-

tle comfort or expectation of privacy to the individual contributor.

Third, it is unclear from the court's opinion in *Local 1814,* how the 45 names could possibly be selected on a truly "random" basis. Since the local union in *Local 1814* was the perpetrator of the alleged abuses and the local union presumably controlled access to the records, it is unclear how the Waterfront Commission could take a random sampling of the 450 names without first having access to the complete records. If, instead, the local union were itself empowered to select the 45 names, then the court's order in *Local 1814* would potentially allow the local union to perpetuate a coverup of its illegal activities.

These considerations undermine the Plaintiffs' argument in the instant case that the Secretary should not presently be permitted to review records outside of Region 5. Instead of offering the Secretary truly random access to the names of contributors, consistent with *Local 1814,* the Plaintiffs propose to disclose, as a substitute, only the names of contributors within Region 5. If the wrongdoing is known by the Plaintiffs to have taken place only in regions other than Region 5, then, of course, the Secretary's examination of Region 5 records will not disclose whether there is any cause to investigate further. The First Amendment simply cannot properly be invoked in this way to cloak potentially illegal activities, and the Court will not narrow the scope of the Secretary's subpoenas as requested by the Plaintiffs.

In any event, because the Court concludes, as discussed below, that the Plaintiffs have failed to make out a *prima facie* case that enforcement of the subpoenas would infringe upon the First Amendment rights of its members or contributors, there is no cause to narrow the scope of the subpoenas, even if the analysis of the courts *Local 1814* were controlling here.

B. *First Amendment Objections*

The Plaintiffs further argue that the affidavits submitted by them in support of their Motion to Quash Subpoena are sufficient to make out a *prima facie* case

that enforcing the Secretary's subpoenas in this case would "chill" the First Amendment associational rights of the contributors to the funds. The Plaintiffs argue that, if the subpoenas are enforced, the names of the contributors would be disclosed both to the Secretary and to "interested parties," including the contributors' political adversaries within the union, i.e., Jerry Tucker and the other members of the New Directions Caucus.

The Secretary argues, in response, that the affidavits are too conclusory and speculative to present a *prima facie* violation of the First Amendment.

... [F]ederal injunctive relief is not available where the complainant alleges that "the exercise of first amendment rights is being 'chilled' by the mere existence, without more, of governmental investigative and data-gathering activity...." Plaintiffs who claim their constitutional rights have been "chilled" must present evidence of a "specific present objective harm" or a threat of "a specific future harm."

*Ghandi v. Police Dept. of City of Detroit,* 747 F.2d 338, 347 (6th Cir.1984) (quoting *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 2324–2326, 33 L.Ed.2d 154 (1972)).

In the instant case, the Plaintiffs have submitted the affidavits of:

1) UAW and Administration Caucus member Richard Shoemaker, who is the Administrative Assistant to Owen Bieber, the president of the UAW, and the records keeper of Plaintiff Friends Social Club;

2) an anonymous $500 contributor to Plaintiff Friends Social Club;

3) UAW and Administration Caucus member Carl Tillery, who is also the manager of the union's Dallas office and the administrator of the Union's Community Action Program in Texas, Louisiana, Oklahoma, and Arkansas;

4) UAW and Administration Caucus member Frank Inman, who is a commissioned International Representative for the UAW, assigned to service local unions in Louisiana, Texas, and Arkansas; and

5) UAW and Administration Caucus member Walter Williams, also a commissioned International Representative, assigned to service retired UAW members residing in Region 5, under the direction of UAW president Owen Bieber.

### 1. Shoemaker and John Doe Affidavits

Mr. Shoemaker's affidavit contains only conclusory predictions such as, "by disclosing information to the Department of Labor, [contributors'] identities might be discovered by opposing associations and subject them to harassment or recriminations," (Shoemaker Aff., Par. 7, p. 3), and "As a result of their fear, members may be discouraged from further participation in the associations." *Id.*

The anonymous "John Doe" affidavit is scarcely more particular. That affidavit states:

8. If the Secretary's subpoenas are enforced, I expect and fear that I will be questioned by the Department of Labor's agents and asked for the names of other members of the Administrative Caucus, and my motives for contributing to the Friends Social Club and for supporting particular UAW candidates and issues. I also fear that my political opponents may learn of my associations, derive strategic advantage from it, and use it against me.

9. Because of such intrusions, the next time there is a UAW convention where issues are proposed or an election where officers or Regional directors are elected, I shall hesitate to join or contribute to my political caucus.

(John Doe Aff., Pars. 8–9, p. 3).

Taken together, these two affidavits establish only the Plaintiffs' subjective fears that disclosure of the names of the contributors to the various flower funds "may" or "might" subject them to harassment or intimidation by political opponents. There is no factual basis in these affidavits to conclude that the enforcement of the subpoenas will have any sort of "chilling" effect on associates and contributors to the various flower funds. Mr. Doe's equivocal statement that "I shall hesitate to join or contribute to my political caucus" does not provide a proper basis to conclude even that his First Amendment freedom of association would be chilled by enforcement of the subpoenas.

This very sort of conclusory affidavit was rejected by the Ninth Circuit in *Dole v. Local Union 375 Plumbers Intern. Union,* 921 F.2d 969 (9th Cir.1990):

The Fund's evidence is equally devoid of objective facts indicating a well-founded fear of threats, harassment, or other adverse consequences if its contributor list is disclosed. Neither the auditor's report nor the news articles even speaks to this issue. The affidavit, moreover, contains no allegations of, let alone facts demonstrating, prior or threatened harassment of members by the government or the public. Although the Fund claims to be political, it does not claim to be politically weak, politically unpopular, or politically disadvantaged. *Cf. Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 99–100, 103 S.Ct. 416, 423–424, 74 L.Ed.2d 250 (1982); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 462–63, 78 S.Ct. 1163, 1171–72, 2 L.Ed.2d 1488 (1958).

The factual gaps in the Fund's evidence are fatal to its case. A subjective fear of reprisal is insufficient to invoke first amendment protection against a disclosure requirement. *See Buckley v. Valeo,* 424 U.S. 1, 71–72, 96 S.Ct. 612, 659–60, 46 L.Ed.2d 659 (1976); *Brock [v. Local 375, Plumbers Intern. Union of America AFL–CIO ],* 860 F.2d [346] at 350 n. 1 [ (9th Cir.1988) ]; *In re Grand Jury Proceeding,* 842 F.2d 1229, 1235 (11th Cir.1988).

\* \* \* \* \* \*

The Fund not only failed to demonstrate its members' susceptibility to harassment, but also neglected to explain how its subjective fear of reprisals could be realized, given that Department [of Labor] policy protects the subpoenaed information from public disclosure. *See McLaughlin,* 880 F.2d at 175. The government will disseminate the information only on a "need to know" basis. *Id.* As a result, the Fund needed to establish that its members legitimately feared retribution by those few governmental employees who would have access to its

records. No such showing has been made in this case.

*Id.*, at 973–974.

In the instant case, the Shoemaker and John Doe affidavits fall far short of sustaining a *prima facie* case because they do not set forth an objective factual basis for their subjective fears of reprisal from any particular person.

### 2. Williams, Tillery, and Inman Affidavits

The affidavits of Walter Williams, Carl Tillery, and Frank Inman are much more specific, and allege specific incidents of "harassment" personally perpetrated by Jerry Tucker. However, when placed in context, these affidavits fail to establish an objective basis to conclude that the enforcement of the Department of Labor subpoenas could itself result in harassment or other "chilling" to the presently unknown and future contributors to the flower funds. Instead, these affidavits show, at most, that Messrs. Williams, Tillery, and Inman received unfavorable treatment by Tucker, which they perceive to be retribution by Tucker for their having taken an overt, active role in Kenneth Worley's 1986 and 1988 campaigns to defeat Tucker in the elections for Region 5 Regional Director.

For example, Tillery states in his affidavit:

7. My first financial contribution to the Administration Caucus occurred in 1959, when I donated $10 to held the campaign of Ted Hawks, who was running against Roy Evans. At the time, the $10 was about as important to me as, say, $500 would be today. My wife and I had three small children.

8. Since that first donation, I have regularly contributed my personal money and time to support this Caucus, elect it candidates, and further its causes. These gifts have been, in every instance, totally voluntary.

9. I supported Ken Worley in the election for Director of Region 5 in 1986. Tucker knew it. One of his supporters, James Maples, accused me of being a "F* * *ing buzzard, watching them votes!"

10. I again supported Ken Worley in the rerun elections which culminated in Tucker's election on September 2, 1988.

(Tillery Affidavit, pars. 7–10, p. 2).

Tillery goes on to say that, soon after the September, 1988 rerun election, Tucker *attempted*, unsuccessfully, to remove him as manager of the UAW's Dallas office. As it turns out, however, Owen Bieber, the UAW's president, and a known member and/or supporter of the Administration Caucus, immediately came to Tillery's rescue and notified the union's officers that they were to disregard Tucker's attempts to displace Tillery.

Similarly, Tucker unsuccessfully attempted to deny Frank Inman authorization to reimburse himself for certain travel expenses incurred by him in accordance with "established practice" (i.e., practice before Tucker was elected Regional Director). Inman eventually did receive reimbursement after Tucker was ousted in the 1989 election by Roy Wyse. (Inman Affidavit, pars. 13–15, p. 3).

Inman asserts that Tucker's refusal to authorize the requested reimbursement was to retaliate against Inman for (again, openly) supporting Kenneth Worley in the 1986 and 1988 elections. (See Inman Affidavit, Par. 11, p. 2). However, the surrounding circumstances suggest that Tucker may instead have denied this particular reimbursement because Tucker perceived that Inman used the trip to New Orleans, in part, to campaign for Roy Wyse in anticipation of the 1989 election. The trip itself occurred in February 18, 1989, when Roy Wyse had already taken a leave of absence to seek the Regional Director position. The hotel bill included a charge for a telephone call to Roy Wyse. (Inman Affidavit, Par. 14, p. 3).

Williams states in his affidavit that Tucker accused him of using his duties with respect to conducting seminars for retirees in Region 5 as an opportunity to campaign against him in the two months preceding the 1988 rerun election. Tucker evidently reported this suspected unlawful activity to the Department of Labor, which subsequently conducted its own investigation. Williams implies that Tucker's complaint

was motivated by retribution for Williams having supported the Administration Caucus because, again, Williams "supported Ken Worley in the election for Director of Region 5 in 1986, and Jerry Tucker knew it." (Williams Affidavit, Pars. 8–13, p. 2).

These Affidavits, taken together or separately, fail to establish an objective basis indicating a well-founded fear of threats, harassment, or other adverse consequences if the information requested in the Department of Labor subpoenas is disclosed to the Department. *See Plumbers, supra,* 921 F.2d, at 973. First, the affidavits of Inman and Williams merely show that Tucker accused them of abusing their official positions within the UAW to campaign on behalf of Administration Caucus candidates while they were professedly conducting official union business. Tucker's suspicions against Williams evidently caused him to file an official complaint with the Department of Labor. These affidavits do not necessarily establish that Williams and Inman were punished for their allegiance to the Administration Caucus *per se,* as opposed to engaging in what Tucker believed to be unlawful activity.

Tillery's affidavit discloses that Tucker attempted, unsuccessfully, to fill the appointed position of Dallas office manager with one of his political supporters because Tillery was an active supporter of the opposition Administration Caucus. However, Tucker's actions in this respect disclose not so much an intent to punish Tillery for his allegiance to the Administration Caucus, but rather an intent to reward his own appointee with a patronage position. In any event, this dispute was evidently resolved by Owen Bieber's asserting his authority as UAW president to retain Tillery as the manager of the Dallas office.

Second, even if these affidavits do show that Tucker wanted to "harass" his political opponents in the Administration Caucus, Tucker was unable to carry out lasting acts of retribution even when he actually occupied the elected office of Regional Director, given that the more powerful positions within the UAW are filled by Administration Caucus members. Thus, each of the incidents detailed in the affidavits was ultimately resolved in favor of the Administration Caucus members and against Tucker. Moreover, Tucker no longer holds the Regional Director office, having been defeated by Administration Caucus candidate Roy Wyse in the 1989 regular election.

Third, the three affidavits make clear that Williams, Tillery, and Inman are all both high-level employees within the UAW and active, overt, supporters of the Administration Caucus. Thus, even if their affidavits had shown a past pattern of retribution by Tucker against them because of their active, open, support for the Administration Caucus, the Court cannot reasonably conclude from this premise that mere disclosure of the subpoenaed information to the Department of Labor could itself result in reprisals to those *unknown* individuals who contributed to the Plaintiff flower funds and who wish to maintain a *private* association with the Administration Caucus.

Fourth, although the Plaintiffs argue that merely complying with the administrative subpoenas will ultimately cause the contribution lists to be disclosed to their political opponents in the New Directions Caucus, they present no objective facts to support this subjective apprehension. In contrast, the affidavit of Richard G. Hunsucker, the Director of the Office of Elections, Trusteeships and International Union Audits, Office of Labor–Management Standards, United States Department of Labor, makes clear that disclosure to any person outside of the Labor and Justice Departments is extremely unlikely.[4] *Plumbers,* 921 F.2d, at 974; *McLaughlin v. Service Employees Union, AFL–CIO,* 880 F.2d 170, 175 (9th Cir.1989). *See also In re Grand Jury Proceeding 82–2,* 705 F.2d 1224 (10th Cir.1982), *cert. den.,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983) (grand jury witness not entitled to assert Fifth Amendment privilege based upon feared prosecution by foreign country be-

---

**4.** The Hunsucker Affidavit states, in pertinent part:

Disclosure of information obtained during investigations conducted pursuant to the

LMRDA to personnel of agencies outside of the Departments of Labor and Justice is restricted by consistent and long-standing OLMS policy. OLMS policy and practice lim-

cause grand jury secrecy rules prohibit disclosure).

The Court concludes that the Plaintiffs have failed to make a *prima facie* showing that enforced compliance with the Department of Labor subpoenas will infringe the First Amendment freedom of association belonging to their members or contributors. Consequently, the Court will order the Plaintiffs to comply with the subpoenas.

At the May 3, 1991 hearing, the Plaintiffs argued strenuously that the Court should *presume* that enforcement of the subpoenas would have an unconstitutional "chilling effect" on their contributors, citing *Local 1814, supra,* 667 F.2d, at 272. However, in that case, the court based its finding of a chilling effect on the fact that the investigating body in that case, the New York Waterfront Commission, had plenary licensing authority over the individual longshoremen who had made allegedly coerced contributions to the local union's political action fund. *Id.* ("The Commission's pervasive control over the economic livelihood of longshoremen is analogous to the control over the professional destiny of Arkansas teachers wielded by school boards in *Shelton v. Tucker,* [364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960) ]."). The Department of Labor simply does not possess this sort of hiring and firing power over union members.

Furthermore, the Plaintiffs' efforts to portray the members and contributors to the Administration Caucus as a persecuted minority are unavailing. *See Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982) (communists); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (NAACP in the 1950s South); *Marshall v. Bramer,* 828 F.2d 355 (6th Cir.1987) (Ku Klux Klan). On the contrary, the Administration Caucus is the in-party within the UAW, and its adherents hold all the elected offices of the union, including the office of president. The Administration Caucus is simply not the sort of political organization whose members are inherently subject to threats or harassment.

CONCLUSION

The Court concludes that the Plaintiffs' objections to the Magistrate Judge's Report and Recommendation are without merit, and the Court will therefore affirm the Report and Recommendation in its entirety. For the reasons stated herein, and the

---

it disclosure of investigative information to personnel of government agencies who have a need to know. This policy is set forth at page 57–4 of the *OLMS Policy Manual ...*

In my experience, requests by another governmental agency for information obtained during an OLMS investigation are exceedingly rare. In the rare instance when such a request is made, the OLMS very seriously and carefully evaluates the reasons advanced in support of such a request. Specifically, the agency looks to the duties and responsibilities of the requesting agency, the nature of the documents requested and the stated reasons supporting the request to determine whether the requesting agency has a justifiable need for the documents. Any disclosure decisions can only be made by an Area Administrator or an appropriate designee.

It is my understanding, however, that investigative information has been shared with other federal agencies and departments during the infrequent instances when OLMS was conducting an investigation with another agency. Such joint investigations occur where it comes to the attention of OLMS that another federal agency has concurrent investigative jurisdiction and a need for union documents. In these infrequent instances, investigators will request and review documents concurrently or will otherwise share information obtained in the course of the investigation. Further, where information is shared with another federal agency in the context of a joint investigation, OLMS is selective in the information which it allows to be released. Free and unrestricted access to investigative files is not given.

*Under no circumstances is the investigative information routinely released to union members or other individuals.* The only occasion in which investigative information has been released, other than to attorneys in the Department of Justice, is in response to Freedom of Information Act requests which are subject to appropriate exemptions. Under the Freedom of Information Act, OLMS does not release investigative information or material from any ongoing or current investigations. However, OLMS uses information gathered in its investigations, as needed, in litigation pursuant to the enforcement of the LMRDA.

(Hunsucker Affidavit, Exhibit 3 to Secretary's Brief in Support of Counterclaim to Enforce Subpoenas, pp. 2–3) (emphasis added).

**1398**

Court being otherwise fully advised in the premises;

NOW THEREFORE;

IT IS HEREBY ORDERED, AD-JUDGED, AND DECREED that the Magistrate Judge's Report and Recommendation is ADOPTED by this Court, and, for the reasons set forth herein and in the Magistrate's Report and Recommendation,

IT IS FURTHER ORDERED, AD-JUDGED, AND DECREED that the Plaintiffs' Motion to Quash Subpoenas is DENIED and the Plaintiffs' claim for injunctive relief is DISMISSED;

IT IS FURTHER ORDERED, AD-JUDGED, AND DECREED that the Secretary shall be granted judgment on its Counterclaim for enforcement of the subpoenas; and

IT IS FURTHER ORDERED, AD-JUDGED, AND DECREED that the Plaintiffs shall comply forthwith with the terms and conditions of the Secretary's subpoenas.

LET JUDGMENT BE ENTERED ACCORDINGLY.