**THE NEW YORK TIMES COMPANY,**
**Plaintiff–Appellee,**

v.

**Alberto GONZALES, in his official capacity as Attorney General of the United States, and the United States of America, Defendants–Appellants.**

**Docket No. 05–2639.**

United States Court of Appeals, Second Circuit.

Argued: Feb. 13, 2006.

Decided: Aug. 1, 2006.

James P. Fleissner, Special Assistant United States Attorney (Patrick J. Fitzgerald, United States Attorney for the Northern District of Illinois, Debra Riggs Bonamici, Daniel W. Gillogly, Assistant United States Attorneys, Chicago, Illinois, on the brief), for Defendants–Appellants.

Floyd Abrams, Cahill Gordon & Reindel LLP, New York, New York (Susan Buckley, Brian Markley, Cahill Gordon & Reindel, New York, New York, on the brief; George Freeman, New York Times Company, New York, New York, of counsel), for Plaintiff–Appellee.

Before: KEARSE, WINTER, and SACK, Circuit Judges.

WINTER, Circuit Judge.

After the attacks on the World Trade Center and the Pentagon on September 11, 2001, the federal government launched or intensified investigations into the funding of terrorist activities by organizations raising money in the United States. In the course of those investigations, the government developed a plan to freeze the assets and/or search the premises of two foundations. Two *New York Times* reporters learned of these plans, and, on the eve of each of the government's actions, called each foundation for comment on the upcoming government freeze and/or searches.

The government, believing that the reporters' calls endangered the agents executing the searches and alerted the targets, allowing them to take steps mitigating the effect of the freeze and searches, began a grand jury investigation into the disclosure of its plans regarding the foundations. It sought the cooperation of the *Times* and its reporters, including access to the *Times'* phone records. Cooperation was refused, and the government threatened to obtain the phone records from third party providers of phone services. The *Times* then brought the present action seeking a declaratory judgment that phone records of its reporters in the hands of third party telephone providers are shielded from a grand jury subpoena by reporter's privileges protecting the identity of confidential sources arising out of both the common law and the First Amendment.

Although dismissing two of the *Times'* claims,[1] Judge Sweet granted the *Times'* motion for summary judgment on its claims that disclosure of the records was barred by both a common law and a First Amendment reporter's privilege. He further held that, although the privileges were qualified, the government had not offered evidence sufficient to overcome them.

---

1. Judge Sweet granted summary judgment to the government on the *Times'* claim that the government attorneys in the present matter had not complied with DOJ guidelines. He also dismissed as moot the *Times'* due process claim. The *Times* does not appeal from these rulings.

We vacate and remand. We hold first that whatever rights a newspaper or reporter has to refuse disclosure in response to a subpoena extends to the newspaper's or reporter's telephone records in the possession of a third party provider. We next hold that we need not decide whether a common law privilege exists because any such privilege would be overcome as a matter of law on the present facts. Given that holding, we also hold that no First Amendment protection is available to the *Times* on these facts in light of the Supreme Court's decision in *Branzburg v. Hayes,* 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

## BACKGROUND

A federal grand jury in Chicago is investigating how two *Times* reporters obtained information about the government's imminent plans to freeze the assets and/or search the offices of Holy Land Foundation ("HLF") and Global Relief Foundation ("GRF") on December 4 and 14, 2001, respectively, and why the reporters conveyed that information to HLF and GRF by seeking comment from them ahead of the search. Both entities were suspected of raising funds for terrorist activities. The government alleges that, "[i]n both cases, the investigations—as well as the safety of FBI agents participating in the actions—were compromised when representatives of HLF and GRF were contacted prior to the searches by *New York Times* reporters Philip Shenon and Judith Miller, respectively, who advised of imminent adverse action by the government." The government maintains that none of its agents were authorized to disclose information regarding plans to block assets or to search the premises of HLF or GRF prior to the execution of those actions. The unauthorized disclosures of such impending law enforcement actions by a government agent can constitute a violation of federal criminal law, *e.g.,* 18 U.S.C. § 793(d) (prohibiting communication of national defense information to persons not entitled to receive it), including the felony of obstruction of justice, 18 U.S.C. § 1503(a).

On October 1, 2001, the *Times* published a story by Miller and another reporter that the government was considering adding GRF to a list of organizations with suspected ties to terrorism. Miller has acknowledged that this information was given to her by "confidential sources." On December 3, 2001, Miller "telephoned an HLF representative seeking comment on the government's intent to block HLF's assets." The following day, the government searched the HLF offices. The government contends that Miller's call alerted HLF to the impending search and led to actions reducing the effectiveness of the search. The *Times* also put an article by Miller about the search on the *Times'* website and in late-edition papers on December 3, 2001, the day before the search. The article claimed to be based in part on information from confidential sources. The *Times* also published a post-search article by Miller in the December 4 print edition.

In a similar occurrence, on December 13, 2001, Shenon "contact[ed] GRF for the purposes of seeking comment on the government's apparent intent to freeze its assets." The following day, the government searched GRF offices. The government has since stated that "GRF reacted with alarm to the tip from [Shenon], and took certain action in advance of the FBI search." It has claimed that "when federal agents entered the premises to conduct the search, the persons present at Global Relief Foundation were expecting them and already had a significant opportunity to remove items." Shenon reported the

search of the GRF offices in an article published on December 15, 2001, the day after the government's search.

After learning that the government's plans to take action against GRF had been leaked, Patrick J. Fitzgerald, the United States Attorney for the Northern District of Illinois, opened an investigation to identify the government employee(s) who disclosed the information to the reporter(s) about the asset freeze/search. On August 7, 2002, Fitzgerald wrote to the *Times* and requested a voluntary interview with Shenon and voluntary production of his telephone records from September 24 to October 2, 2001, and December 7 to 15, 2001. Fitzgerald's letter stated that "[i]t has been conclusively established that Global Relief Foundation learned of the search from reporter Philip Shenon of the *New York Times*";[2] the requested interview and records were therefore essential to investigating "leaks which may strongly compromise national security and thwart investigations into terrorist fundraising." Anticipating the *Times'* response, the letter argued in strong language that the First Amendment did not protect the "potentially criminal conduct" of Shenon's source or Shenon's "decision ... to provide a tip to the subject of a terrorist fundraising inquiry." The *Times* refused the request for cooperation on the ground that the First Amendment provides protection against a newspaper "having to divulge confidential source information to the Government."

On July 12, 2004, Fitzgerald wrote again to the *Times* and renewed the request for an interview with Shenon and the production of his telephone records. He enlarged the request to include an interview with Miller and the production of her telephone records from September 24 to October 2, 2001, November 30 to December 4, 2001, and December 7 to 15, 2001. Fitzgerald stated that the investigation involved "extraordinary circumstances" and that any refusal by the *Times* to provide the pertinent information would force him to seek the telephone records from third parties, i.e., the *Times'* telephone service providers. The *Times* again refused the request and questioned whether the government had exhausted all alternative sources. The *Times* argued that turning over the reporters' telephone records would give the government access to all the reporters' sources during the time periods indicated, not just those relating to the government's investigation. The *Times* believed that such a request "would be a fishing expedition well beyond any permissible bounds."

The *Times* also contacted its telephone service providers and requested that they notify the *Times* if they received any demand from the government to turn over the disputed records, giving the *Times* an opportunity to challenge the government's action. The telephone service providers declined to agree to that course of action.

Fitzgerald responded with a letter stating that he had "exhausted all reasonable alternative means" of obtaining the information but that he was not obligated to disclose those steps to the *Times* nor did he "intend to engage in debate by letter." Fitzgerald, however, invited the *Times* to contact him if it "wish[ed] to have a serious conversation ... to discuss cooperating in this matter."

On August 4, 2004, attorneys Floyd Abrams and Kenneth Starr wrote a letter on behalf of the *Times* to James Comey, then the Deputy Attorney General.

---

2. The record is unclear as to whether the reporters mentioned the searches as well as the asset freezes to the targets. However, there is evidence that one of the foundations had a lawyer present when agents arrived to begin the search.

Abrams and Starr requested an opportunity to discuss Fitzgerald's efforts to obtain the telephone records of Shenon and Miller and reaffirmed that the *Times* believed that it was not required to divulge the disputed records. The letter also requested that, if the telephone records were sought from the *Times'* third party service providers, the *Times* reporters be given the opportunity to "assert their constitutional right to maintain the confidentiality of their sources ... in a court of law." On September 23, 2004, Comey rejected the request for a meeting, saying: "Having diligently pursued all reasonable alternatives out of regard for First Amendment concerns, and having adhered scrupulously to Department policy, including a thorough review of Mr. Fitzgerald's request within the Department of Justice, we are now obliged to proceed" with efforts to obtain the telephone records from a third party. Comey noted that the government did not "have an obligation to afford the *New York Times* an opportunity to challenge the obtaining of telephone records from a third party prior to [its] review of the records, especially in investigations in which the entity whose records are being subpoenaed chooses not to cooperate with the investigation."

Five days later, the *Times* filed the present action in the Southern District of New York. The counts of the complaint pertinent to this appeal sought a declaratory judgment that reporters' privileges against compelled disclosure of confidential sources prevented enforcement of a subpoena for the reporters' telephone records in the possession of third parties. The claimed privileges were derived from the federal common law and the First Amendment.

On October 27, 2004, the government moved to dismiss the complaint on the ground that plaintiffs have an adequate remedy under Federal Rule of Criminal Procedure 17. The *Times* opposed the government's motion to dismiss and moved for summary judgment. The government then filed a cross motion for summary judgment.

Judge Sweet denied the government's motion to dismiss. *New York Times Co. v. Gonzales,* 382 F.Supp.2d 457 (S.D.N.Y. 2005). He concluded that he had discretion to entertain the action for declaratory judgment and had no reason to decline to exercise that discretion, especially because a motion to quash would not provide the *Times* the same relief provided by a declaratory judgment. *Id.* at 475–79. Judge Sweet granted the *Times'* motion for summary judgment on its claims that Shenon's and Miller's telephone records were protected against compelled disclosure of confidential sources by two qualified privileges. *Id.* at 492, 508. One privilege was derived from the federal common law pursuant to Federal Rule of Evidence 501; the other source was the First Amendment. *Id.* at 490–92, 501–08, 510–13. The government appealed.

## DISCUSSION

### a) *The Declaratory Judgment Act*

 Under the Declaratory Judgment Act, a district court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). A district court may issue a declaratory judgment only in "a case of actual controversy within its jurisdiction." *Id.* The Act does not require the courts to issue a declaratory judgment. Rather, it " 'confers a discretion on the courts rather than an absolute right upon the litigant.' " *Wilton v. Seven Falls Co.,* 515 U.S. 277, 287, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) (citing *Public Serv. Comm'n of Utah v. Wycoff Co.,* 344

U.S. 237, 241, 73 S.Ct. 236, 97 L.Ed. 291 (1952)).

The government argues that the district court should not have exercised jurisdiction over this action for two reasons: (i) because there is a "special statutory proceeding" for the *Times'* claim under Federal Rule of Criminal Procedure 17(c)'s provisions for quashing a subpoena, a declaratory judgment is unnecessary, and, (ii) because the district judge improperly balanced the factors guiding the exercise of discretion.

■ We review the underlying legal determination that Rule 17(c) is not a special statutory proceeding precluding a declaratory judgment action *de novo*, and we review the decision to entertain such an action for abuse of discretion. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 388–89 (2d Cir.2005).

### 1. Special Statutory Proceeding

Federal Rule of Civil Procedure 57 states that "[t]he existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate." However, the Advisory Committee's Note purports to qualify this Rule by stating that a "declaration may not be rendered if a special statutory proceeding has been provided for the adjudication of some special type of case, but general ordinary or extraordinary legal remedies, whether regulated by statute or not, are not deemed special statutory proceedings." Fed.R.Civ.P. 57 advisory committee's note.

Rule 17(c)(2) permits a court to quash or modify a subpoena that orders a witness to produce documents and other potential evidence, when "compliance would be unreasonable or oppressive." Fed.R.Crim.P. 17(c)(2). Although Rule 17 itself is not a statute, it is referenced by 18 U.S.C. § 3484. The government contends that Rule 17(c) is a special statutory proceeding within the meaning of the Advisory Committee's Note and that its existence therefore renders declaratory relief inappropriate. It further notes that there is only one decision in which a plaintiff attempted to challenge federal grand jury subpoenas through a declaratory judgment action, *Doe v. Harris*, 696 F.2d 109 (D.C.Cir. 1982), and that did not entail a ruling on whether the complaint stated a valid claim for relief. *Id.* at 112.

■ However, since the enactment of the Declaratory Judgment Act, only a handful of categories of cases have been recognized as "special statutory proceedings" for purposes of the Advisory Committee's Note. These include: (i) petitions for habeas corpus and motions to vacate criminal sentences, *e.g.*, *Clausell v. Turner*, 295 F.Supp. 533, 536 (S.D.N.Y.1969); (ii) proceedings under the Civil Rights Act of 1964, *e.g.*, *Katzenbach v. McClung*, 379 U.S. 294, 296, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964); and (iii) certain administrative proceedings, *e.g.*, *Deere & Co. v. Van Natta*, 660 F.Supp. 433, 436 (M.D.N.C.1986) (involving a decision on patent validity before U.S. patent examiners). Each of these categories involved procedures and remedies specifically tailored to a limited subset of cases, usually one brought under a particular statute. Rule 17(c) is not of such limited applicability. Rather, it applies to all federal criminal cases. Were we to adopt the government's theory and treat a motion to quash under Rule 17(c) as a "special statutory proceeding," we would establish a precedent potentially qualifying a substantial number of federal rules of criminal and civil procedure as special statutory proceedings and thereby severely limit the availability of declaratory relief. Therefore, we hold that the existence of Rule 17(c) does not preclude *per se* a declaratory judgment.

2. Application of the *Dow Jones* Factors

■ In *Dow Jones & Co., Inc. v. Harrods Ltd.*, 346 F.3d 357, 359–60 (2d Cir. 2003), we outlined five factors to be considered before a court entertains a declaratory judgment action: (i) "whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved"; (ii) "whether a judgment would finalize the controversy and offer relief from uncertainty"; (iii) "whether the proposed remedy is being used merely for 'procedural fencing' or a 'race to res judicata'"; (iv) "whether the use of a declaratory judgment would increase friction between sovereign legal systems or improperly encroach on the domain of a state or foreign court"; and (v) "whether there is a better or more effective remedy." *Id.* (citations omitted).

■ We review a district court's application of the *Dow Jones* factors only for abuse of discretion. *Duane Reade*, 411 F.3d at 388. The district court did not abuse its discretion in entertaining the present action. Factors (i) and (ii) favor a decision on the merits. There is a substantial chance that the phone records, although they will not reveal the content of conversations or the existence of other contacts, will provide reasons to focus on some individuals as being the source(s). If so, the *Times* may have no chance to assert its claim of privileges as to the source(s)' identity. It would therefore be "useful" to clarify the existence of the asserted privileges now. *Dow Jones*, 346 F.3d at 359. Moreover, a declaratory judgment will "finalize the controversy" over the existence of any privilege on the present facts and provide "relief from uncertainty" in that regard. *Id.* For similar reasons, factor (iii) also calls for a decision on the merits. Seeking a final resolution of the privilege issue is surely more than

"procedural fencing" on the facts of this case. *Id.* at 359–60. Factor (iv) is inapplicable on its face.

As for factor (v), a motion to quash under Rule 17(c) would not offer the *Times* the same relief as a declaratory action under the circumstances of this case. First, a motion to quash is not available if the subpoena has not been issued. 2 Charles Alan Wright, Federal Practice and Procedure § 275 (3d ed.2000) (citing *In re Grand Jury Investigation (General Motors Corp.)*, 31 F.R.D. 1 (S.D.N.Y.1962)). Second, it is unknown whether subpoenas have been issued to telephone carriers or not, and if so, whether the carriers have already complied. It is also unclear whether, when a subpoena has been issued to a third party and the third party has complied, a motion to quash is still a viable path to a remedy. *See* Fed.R.Crim.P. 17(c) (not addressing whether a subpoena may be quashed after it is complied with).

The district court, therefore, did not abuse its discretion in concluding that it should exercise jurisdiction over this action.

b) *Reporters' Privilege*

1. Subpoenas to Third Party Providers

The threatened subpoena seeks the reporters' telephone records from a third party provider. The government argues that, whatever privileges the reporters may themselves have, they cannot defeat a subpoena of third party telephone records. Given a dispositive precedent of this court, we cannot agree.

In *Local 1814, International Longshoremen's Ass'n, AFL–CIO v. Waterfront Commission*, 667 F.2d 267 (2d Cir.1981), a union sought to enjoin a subpoena issued to a third party by the Waterfront Commission. *Id.* at 269. In the course of

investigating whether longshoremen had been coerced into authorizing payroll deductions to the union's political action committee, the Commission issued a subpoena to the third party that administered the union's payroll deductions. *Id.* The union challenged the subpoena, and we concluded that the union's First Amendment rights were implicated by the subpoena to the third party. *Id.* at 271. We stated, "First Amendment rights are implicated whenever government seeks from third parties records of actions that play an integral part in facilitating an association's normal arrangements for obtaining members or contributions." *Id.* Because the payroll deduction system was an integral part of the fund's operations, the records of the third party were "entitled to the same protection available to the records of the [union]." *Id.*

██ Under this standard, so long as the third party plays an "integral role" in reporters' work, the records of third parties detailing that work are, when sought by the government, covered by the same privileges afforded to the reporters themselves and their personal records. Without question, the telephone is an essential tool of modern journalism and plays an integral role in the collection of information by reporters.[3] Under *Longshoremen's,* therefore, any common law or First Amendment protection that protects the reporters also protects their third party telephone records sought by the government.

**2. Common Law Privilege**

The *Times* claims that a common law privilege protects against disclosure of the identity of the confidential source(s) who informed its reporters of the imminent actions against HLF and GRF. The issue of the existence and breadth of a reporter's common law privilege is before us in two contexts.

It arises, first, in the context of the *Times'* claim with regard to the third party providers' phone records, as noted above. Although a record of a phone call does not disclose anything about the reason for the call, the topics discussed, or other meetings between the parties to the calls, it is a first step of an inquiry into the identity of the reporters' source(s) of information regarding the HLF and GRF asset freezes/searches. The identity of the source(s) is at the heart of the claimed privilege that necessitates a declaratory judgement.

The privilege issue arises, second, in a more subtle way. The *Times* also argues that subpoenas to third party providers are overbroad because they might disclose the reporters' sources on matters not relevant to the investigation at hand. This overbreadth argument turns on the validity of the subsidiary claim that the government has not exhausted alternative sources that avoid the disclosure of sensitive information on irrelevant sources and

---

**3.** The government relies on *Reporters Committee for Freedom of the Press v. American Telephone & Telegraph Co.,* 593 F.2d 1030, 1048–49 (D.C.Cir.1978), which suggested that journalists have no more First Amendment rights in their toll-call records in the hands of third parties than they have in records of third party airlines, hotels, or taxicabs. Under *Longshoremen's* integral role standard, however, third party telephone records may be distinguishable from third party travel rec-

ords. Telephone lines—which carry voice and facsimile communication—are a relatively indispensable tool of national or international journalism, and one that requires the service of a third party provider. The same is arguably not true of lodging, air travel, and taxicabs. Whether such a distinction is valid need not be determined, however, because *Longshoremen's* governs this case in any event.

do not implicate privileged material. Because the reporters are the only reasonable alternative source that can provide reliable information allowing irrelevant material to be excluded from the subpoena, the privilege of the reporters to refuse to cooperate is at stake in this respect also. That is to say, the overbreadth argument poses the question of whether the reporters themselves are unprivileged alternative sources of information who can be compelled to identify the informant(s) relevant to the present investigation.

■ Using the method of analysis set out in *Jaffee v. Redmond,* 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), in which the Supreme Court recognized a privilege between a psychotherapist and a patient and applied it to social workers and their patients, the district court concluded that a qualified reporter's privilege exists under Federal Rule of Evidence 501. *New York Times Co.,* 382 F.Supp.2d at 492–508. After finding that such a privilege exists, the district court held that any such privilege would be qualified rather than absolute and that it would not be overcome on the facts of the present case. *Id.* at 497. We agree that any such privilege would be a qualified one, but we also conclude that it would be overcome as a matter of law on these facts. It is unnecessary, therefore, for us to rule on whether such a privilege exists under Rule 501.

### A. Any Common Law Privilege Would Be Qualified

The district court's conclusion that any common law privilege derived from Federal Rule of Evidence 501 would be qualified rather than absolute was based on several factors. While the court adopted the view that the lack of protection afforded by the absence of any privilege would impact negatively on important private and public interests but yield only a "modest eviden-

tiary benefit," it also recognized that in particular circumstances "compelling public interests" might require that the privilege be overcome. 382 F.Supp.2d at 501. This recognition acknowledges that the government has a highly compelling and legitimate interest in preventing disclosure of some matters and that that interest would be seriously compromised if the press became a conduit protected by an absolute privilege through which individuals might covertly cause disclosure.

In that regard, the district court noted that every federal court that had recognized a reporter's privilege under Federal Rule of Evidence 501 had concluded that any such privilege was a qualified one, 382 F.Supp.2d at 501, and that most states affording such a privilege also provided only qualified protection, *id.* at 502–03. We agree with, and substantially adopt, the district court's reasoning on this point.

### B. Privilege Overcome

■ We need not determine the precise contours of any such qualified privilege. Various formulations have included: (i) a test requiring a showing of "clear relevance," *United States v. Cutler,* 6 F.3d 67, 74 (2d Cir.1993), (ii) one requiring that the government must (1) show that there is probable cause to believe that the newsman has information that is clearly relevant to a specific probable violation of law; (2) demonstrate that the information sought cannot be obtained by alternative means less destructive of First Amendment rights; and (3) demonstrate a compelling and overriding interest in the information, *Branzburg,* 408 U.S. at 743, 92 S.Ct. 2646 (Stewart, J., dissenting); or (iii) a test requiring a showing that the information sought is "highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other

available sources," *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.1982) (citations omitted). The district court selected (iii) as the governing formula and concluded that the government had not shown either materiality or the unavailability elsewhere of the same information. 382 F.Supp.2d at 510–13. We disagree. We believe that, whatever standard is used, the privilege has been overcome as a matter of law on the facts before us.

The grand jury investigation here is focused on: (i) the unauthorized disclosures of imminent plans of federal law enforcement to seize assets and/or execute searches of two organizations under investigation for funding terrorists, followed by (ii) communications to these organizations that had the effect of alerting them to those plans, perhaps endangering federal agents and reducing the efficacy of the actions.

The grand jury thus has serious law enforcement concerns as the goal of its investigation. The government has a compelling interest in maintaining the secrecy of imminent asset freezes or searches lest the targets be informed and spirit away those assets or incriminating evidence. At stake in the present investigation, therefore, is not only the important principle of secrecy regarding imminent law enforcement actions but also a set of facts—informing the targets of those impending actions—that may constitute a serious obstruction of justice.

It is beyond argument that the evidence from the reporters is on its face critical to this inquiry. First, as the recipients of the disclosures, they are the only witnesses—other than the source(s)—available to identify the conversations in question and to describe the circumstances of the leaks. Second, the reporters were not passive collectors of information whose evidence is a convenient means for the government to

identify an official prone to indiscretion. The communications to the two foundations were made by the reporters themselves and may have altered the results of the asset freezes and searches; that is to say, the reporters' actions are central to (and probably caused) the grand jury's investigation. Their evidence as to the relationship of their source(s) and the leaks themselves to the informing of the targets is critical to the present investigation. There is simply no substitute for the evidence they have.

The centrality of the reporters' evidence to the investigation is demonstrated by the *Times'* echoing of the district court's understandable view that some or many of the phone records sought are not material because they do not relate to the investigation and may include reporters' sources on other newsworthy matters. The *Times* seeks to add to that argument by stating that the government has not exhausted available non-privileged alternatives to the obtaining of the phone records.

This argument is more ironic than persuasive. Redactions of documents are commonplace where sensitive and irrelevant materials are mixed with highly relevant information. *United States v. Nixon*, 418 U.S. 683, 713–14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002*, 318 F.3d 379, 386 (2d Cir. 2003) (describing *in camera* review as "a practice both long-standing and routine in cases involving claims of privilege" and collecting cases). Our caselaw regarding disclosure of sources by reporters provides ample support for redacting materials that might involve confidential sources not relevant to the case at hand. *United States v. Cutler*, 6 F.3d 67, 74–75 (2d Cir.1993) (rejecting defendant's subpoena seeking reporters' unpublished notes because the notes' "irrelevance . . . seems clear"). In

the present case, therefore, any reporters' privilege—or lesser legal protection—with regard to non-material sources can be fully accommodated by the appropriate district court's *in camera* supervision of redactions of phone records properly shown to be irrelevant.

However, the knowledge and testimony of the reporters does not have a reasonably available substitute in redacting the records because it is the content of the underlying conversations and/or other contacts that would determine relevancy. Redactions would therefore require the cooperation of the *Times* or its reporters, or both, in identifying the material to be redacted and verifying it as irrelevant, or in credibly disclosing the reporters' source(s) to the grand jury and obviating the need to view in gross the phone records.

In short, the only reasonable unavailed-of alternative that would mitigate the overbreadth of the threatened subpoena is the cooperation of the reporters and the *Times*.[4] We fully understand the position taken by the *Times* regarding protection of its reporters' confidential communications with the source(s) of information regarding the HLF and GRF asset freezes/searches. However, the government, having unsuccessfully sought the *Times'* cooperation, cannot be charged by the *Times* with having issued an unnecessarily overbroad subpoena. By the same token, the government, if offered cooperation that eliminates the need for the examination of the *Times'* phone records in gross, cannot resist the narrowing of the information to be produced. *United States v. Burke*, 700 F.2d 70, 76 (2d Cir.1983) (rejecting subpoe-

na when the information it sought would serve a "solely cumulative purpose").

There is therefore a clear showing of a compelling governmental interest in the investigation, a clear showing of relevant and unique information in the reporters' knowledge, and a clear showing of need. No grand jury can make an informed decision to pursue the investigation further, much less to indict or not indict, without the reporters' evidence. It is therefore not privileged.

We emphasize that our holding is limited to the facts before us, namely the disclosures of upcoming asset freezes/searches and informing the targets of them. For example, in order to show a need for the phone records, the government asserts by way of affidavit that it has "reasonably exhausted alternative investigative means" and declines to give further details of the investigation on the ground of preserving grand jury secrecy. While we believe that the quoted statement is sufficient on the facts of this case, we in no way suggest that such a showing would be adequate in a case involving less compelling facts. In the present case, the unique knowledge of the reporters is at the heart of the investigation, and there are no alternative sources of information that can reliably establish the circumstances of the disclosures of grand jury information and the revealing of that information to targets of the investigation.

We see no danger to a free press in so holding. Learning of imminent law enforcement asset freezes/searches and informing targets of them is not an activity essential, or even common, to journalism.[5]

---

4. Understandably, the *Times* has not argued that identification of the source(s) by the reporters or the paper would be a reasonable, alternative means of obtaining the information.

5. We harbor no doubt whatsoever that, on the present record, the test adopted by our dissenting colleague for overcoming a qualified privilege has been satisfied. Following his articulation of that test, the following is apparent. First, ascertaining the reporters'

Where such reporting involves the uncovering of government corruption or misconduct in the use of investigative powers, courts can easily find appropriate means of protecting the journalists involved and their sources. *Branzburg*, 408 U.S. at 707–08, 92 S.Ct. 2646 ("[A]s we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment. Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth.") (footnote omitted).

### 3. First Amendment Protection

*Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), is the governing precedent regarding reporters' protection under the First Amendment from disclosing confidential sources. That case was a consolidated appeal of various reporters' claims that they could not be compelled to testify before a grand jury concerning activity they had observed pursuant to a promise of confidentiality. *Id.* at 667–79, 92 S.Ct. 2646. The reporters argued that "the burden on news gathering resulting from compelling reporters to disclose confidential information outweighs any public interest in obtaining the information." *Id.* at 681, 92 S.Ct. 2646.

The court concluded, on a 5–4 vote, that the reporters had no such privilege. Justice White wrote the majority opinion. Justice Powell, although concurring in the White opinion, wrote a brief concurrence. Justice Stewart wrote a dissent in which Justices Brennan and Marshall concurred. Justice Douglas wrote a further dissent.

Justice White's majority opinion stated, "We are asked to create another [testimonial privilege] by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do." *Id.* at 690, 92 S.Ct. 2646. While the body of Justice White's opinion was decidedly negative toward claims similar to those raised by the *Times*, it noted that the First Amendment might be implicated if a subpoena were issued to a reporter in bad faith. "[G]rand jury investigations if instituted or conducted other than in good faith, would pose wholly different questions for resolution under the First Amendment." *Id.* at 707,

---

knowledge of the identity of their source and of the events leading to the disclosure to the targets of the imminent asset freezes/searches is clearly essential to an investigation into the alerting of those targets. Second, that knowledge is not obtainable from other sources; even a full confession by the leaker would leave the record incomplete as to the facts of, and reasons for, the alerting of the targets. Third, we know of no sustainable argument that maintaining the confidentiality of the imminent asset freezes/searches would be contrary to the public interest; we see no public interest in compelling disclosure of the imminent asset freezes/searches; we see no public interest in having information on imminent asset freezes/searches flow to the public, much less to the targets; and we see no need for further explication of the government's powerful interest in maintaining the secrecy of imminent asset freezes/searches. All of this is obvious on the present record. Our colleague's arguments to the contrary may be suited to the paradigmatic case where a newsperson is one of many witnesses to an event and the actions and state of mind of the newsperson are not in issue. *See In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C.Cir.2005). The present case, however, does not fit the paradigm because, as discussed in the text, the reporters were active participants in the alerting of the targets.

92 S.Ct. 2646. *See also id.* at 700, 92 S.Ct. 2646 (stating that "Nothing in the record indicates that these grand juries were probing at will and without relation to existing need.") (citation, brackets, and quotation marks omitted).

Justice Powell joined the majority opinion and also wrote a short concurrence for the purpose of "emphasiz[ing] what seems to me to be the limited nature of the Court's holding." *Id.* at 709, 92 S.Ct. 2646 (Powell, J., concurring). He stated that:

> If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationship without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered.

*Id.* at 710, 92 S.Ct. 2646. Justice Powell then concluded that "[t]he asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.*

In dissent, Justice Stewart stated that he would recognize a First Amendment right in reporters to decline to reveal confidential sources. *Id.* at 737–38, 92 S.Ct. 2646. The right would be qualified, however, and subject to being overcome under the test quoted above. *Id.* at 743, 92 S.Ct. 2646, *supra* at Part (b)(2)(B). Justices Brennan and Marshall joined that opinion.

Justice Douglas's dissent recognized an absolute right in journalists not to appear before grand juries to testify regarding journalistic activities. He reasoned that unless those activities implicated a journalist in a crime, the First Amendment was a shield against answering the grand jury's questions. If the journalist was implicated in a crime, the Fifth Amendment would provide a similar shield.

The parties debate various of our decisions addressing First Amendment claims with regard to reporters' rights to protect confidences and the import of *Branzburg*. *Gonzales v. National Broadcasting Co., Inc.*, 194 F.3d 29 (2d Cir.1999); *United States v. Cutler*, 6 F.3d 67 (2d Cir.1993); *United States v. Burke*, 700 F.2d 70 (2d Cir.1983); *In re Petroleum Prods. Antitrust Litig.*, 680 F.2d 5 (2d Cir.1982).

We see no need to add a detailed analysis of our precedents. None involved a grand jury subpoena or the compelling law enforcement interests that exist when there is probable cause to believe that the press served as a conduit to alert the targets of an asset freeze and/or searches. *Branzburg* itself involved a grand jury subpoena, is concededly the governing precedent,[6] and none of the opinions of the

---

6. *See In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964, 970 (D.C.Cir.2005); *United States v. Smith*, 135 F.3d 963, 968–69 (5th Cir.1998); *In re Grand Jury Proceedings*, 5 F.3d 397, 400 (9th Cir.1993); *In re Grand Jury Proceedings*, 810 F.2d 580, 584 (6th Cir. 1987). The D.C. Circuit noted:

> Unquestionably, the Supreme Court decided in *Branzburg* that there is no First Amendment privilege protecting journalists from appearing before a grand jury or from testifying before a grand jury or otherwise providing evidence to a grand jury regardless of any confidence promised by the reporter to any source. The Highest Court has spoken and never revisited the question. Without doubt, that is the end of the matter.

> *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d at 970.

Court, save that of Justice Douglas,[7] adopts a test that would afford protection against the present investigation.

■ Certainly, nothing in Justice White's opinion or in Justice Powell's concurrence calls for preventing the present grand jury from accessing information concerning the identity of the reporters' source(s).[8] The disclosure of an impending asset freeze and/or search that is communicated to the targets is of serious law enforcement concerns, and there is no suggestion of bad faith in the investigation or conduct of the investigation.

Indeed, as discussed in detail above, the test outlined in Justice Stewart's *Branzburg* dissent would be met in the present case. The serious law enforcement concerns raised by targets learning of impending searches because of unauthorized disclosures to reporters who call the targets easily meets Justice Stewart's standards of relevance and need. As also noted, while it is true that the disclosure of all phone records over a period of time may exceed the needs of the grand jury, the overbreadth can be cured only if the *Times* and its reporters agree to cooperate in tailoring the information provided to those needs. Otherwise, the overbreadth does not defeat the subpoena.

## CONCLUSION

Accordingly, the judgment of the district court is vacated, and the case is remanded to enter a declaratory judgment in accordance with the terms of this opinion and without prejudice to the district court's redaction of materials irrelevant to the investigation upon an offer of appropriate cooperation.

SACK, Circuit Judge, dissenting.

For reasons outlined in Part I below, I agree with much of the majority opinion. I ultimately disagree with the result the majority reaches, however, and therefore respectfully dissent.

### I.

Declaratory judgment can in some circumstances—and does in these—serve as a salutary procedural device for testing the propriety of a government attempt to compel disclosure of information from journalists. It is indeed questionable whether, in the case before us, the plaintiff could have obtained effective judicial review of the validity of the government's proposed subpoena of the plaintiff's phone records without it. The Court holds today that contrary to the government's view, a member of the press may in appropriate circumstances obtain a declaratory judgment to protect the identity of his or her sources of information in the course of a criminal inquiry. It makes clear, moreover, that in the grand jury context, such an action need not be brought in a jurisdiction in which the grand jury sits. I agree.

7. The government has not stated that a crime has taken place; at this stage, it is merely investigating the circumstances of the disclosures that led to the alerting of the targets of the asset freeze and/or searches. We need not, therefore, explore the implications for the *Times* or its reporters of the privilege as described by Justice Douglas.

8. Justice Powell's concurrence suggests that the First Amendment affords a privilege "if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation." 408 U.S. at 710, 92 S.Ct. 2646. The threatened subpoena thus may be overbroad under the First Amendment because it will surely yield some information that bears "only a remote and tenuous relationship" to the investigation. As we note elsewhere, however, this overbreadth problem can be remedied by redaction with the cooperation of the *Times* and its reporters.

The Court's decision also confirms the ability of journalists to protect the identities of their sources in the hands of third-party communications-service providers—in this case, one or more telephone companies. Without such protection, prosecutors, limited only by their own self-restraint, could obtain records that identify journalists' confidential sources in gross and virtually at will. Reporters might find themselves, as a matter of practical necessity, contacting sources the way I understand drug dealers reach theirs—by use of clandestine cell phones and meetings in darkened doorways. Ordinary use of the telephone could become a threat to journalist and source alike. It is difficult to see in whose best interests such a regime would operate.

More fundamentally still, the Court today reaffirms the role of federal courts in mediating between the interests of law enforcement in obtaining information to assist their discovery and prosecution of violations of federal criminal law, and the interests of the press in maintaining source-confidentiality for the purpose of gathering information for possible public dissemination. For the question at the heart of this appeal is not so much whether there is protection for the identity of reporters' sources, or even what that protection is, but which branch of government decides whether, when, and how any such protection is overcome.

The parties begin on common ground. The government does not dispute that journalists require substantial protection from compulsory government processes that would impair the journalists' ability to gather and disseminate the news. Since 1970, two years before the Supreme Court decided *Branzburg v. Hayes*, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), United States Department of Justice regulations have set forth a departmental policy designed to protect the legitimate needs of the news media in the context of criminal investigations and prosecutions.

The Department of Justice guidelines are broadly worded. The preamble states:

Because freedom of the press can be no broader than the freedom of reporters to investigate and report the news, the prosecutorial power of the government should not be used in such a way that it impairs a reporter's responsibility to cover as broadly as possible controversial public issues. This policy statement is thus intended to provide protection for the news media from forms of compulsory process, whether civil or criminal, which might impair the news gathering function.

28 C.F.R. § 50.10. The guidelines require that "the approach in every case must be to strike the proper balance between the public's interest in the free dissemination of ideas and information and the public's interest in effective law enforcement and the fair administration of justice," *id.* § 50.10(a); that "[a]ll reasonable attempts should be made to obtain information from alternative sources before considering issuing a subpoena to a member of the news media," *id.* § 50.10(b); and that "[i]n criminal cases, [before a subpoena is served on a member of the media,] there should be reasonable grounds to believe, based on information obtained from nonmedia sources, that a crime has occurred, and that the information sought is essential to a successful investigation—particularly with reference to directly establishing guilt or innocence. The subpoena should not be used to obtain peripheral, nonessential, or speculative information," *id.* § 50.10(f)(1).

In 1980, the guidelines were extended to provide that "all reasonable alternative investigative steps should be taken before considering issuing a subpoena for telephone toll records of any member of the

news media." *Id.* Subsection (g) of the guidelines reads in part:

> In requesting the Attorney General's authorization for a subpoena for the telephone toll records of members of the news media, the following principles will apply:
>
> (1) There should be reasonable ground to believe that a crime has been committed and that the information sought is essential to the successful investigation of that crime. The subpoena should be as narrowly drawn as possible; it should be directed at relevant information regarding a limited subject matter and should cover a reasonably limited time period. In addition, prior to seeking the Attorney General's authorization, the government should have pursued all reasonable alternative investigation steps as required by paragraph (b) of this section [quoted above].
>
> . . . .

*Id.* § 50.10(g).

The government has made clear that it considers itself bound by these guidelines, *see, e.g.,* Gov't Br. at 63, and asserts that it has abided by them in this case, *see, e.g., id.;* Letter of James Comey, Deputy Attorney General, to Floyd Abrams, attorney for the plaintiff, dated Sept. 23, 2004 (referring to the Department as "[h]aving diligently pursued all reasonable alternatives out of regard for First Amendment concerns, and having adhered scrupulously to Department policy").

While the government argues strenuously that the Department's guidelines do not create a judicially enforceable privilege,[1] the substantive standards that they establish as Department policy are strikingly similar to the reporter's privilege as we have articulated it from time to time. For example, in *In re Petroleum Products Antitrust Litigation,* 680 F.2d 5, 7–8 (2d Cir.) (per curiam) (civil case), *cert. denied,* 459 U.S. 909, 103 S.Ct. 215, 74 ·L.Ed.2d 171 (1982) (quoted by the majority, *ante* at 169), we said: "[D]isclosure [of the identity of a confidential source] may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources." This is also the standard urged upon us by the plaintiff and apparently adopted by the district court. *See N.Y. Times Co. v. Gonzales,* 382 F.Supp.2d 457 (S.D.N.Y.2005) ("*N.Y.Times*") (*passim*). The guidelines' test is thus very much like the test that the plaintiff asks us to apply.

The primary dispute between the parties, then, is not whether the plaintiff is protected in these circumstances, or what the government must demonstrate to overcome that protection, but to whom the demonstration must be made. The government tells us that under *Branzburg,* "except in extreme cases of [prosecutorial] bad faith," Tr. of Oral Argument, Feb. 13, 2006, at 12, federal courts have no role in monitoring its decision as to how, when, and from whom federal prosecutors or a federal grand jury can obtain information. Apparently based on that supposition, the government did not make a serious attempt to establish to the district court's satisfaction that the standard for requiring disclosure had been met. Neither has it argued forcefully to us that it in fact did so.[2] For example, with respect to the government's assertion that it has "pur-

---

1. The plaintiff does not argue otherwise on this appeal.

2. Only the last six and a half pages of its sixty-six page brief to us address the plaintiff's contention that the government has not met the burden.

sued all reasonable alternative investigation steps" to source disclosure (guidelines formulation) or that the information it needs is "not obtainable from other available sources" (*Petroleum Products* formulation), the government tells us only that:

> The Affirmation of the United States Attorney for the Northern District of Illinois, who was personally involved in conducting, and responsible for supervising, the ongoing grand jury investigation, stated that "the government had reasonably exhausted alternative investigative means," and that the Attorney General of the United States had authorized the issuance of the challenged subpoenas pursuant to the DOJ Guidelines.

Gov't Br. at 63.[3] The government thus takes the position that it is entitled to obtain the *Times'* telephone records in order to determine the identity of its reporters' confidential sources because it has satisfied *itself* that the applicable standard has been met.

I do not think, and I read the majority opinion to reject the proposition, that the executive branch of government has that sort of wholly unsupervised authority to police the limits of its own power under these circumstances. As Judge Tatel, concurring in judgment in *In re Grand Jury Subpoena, Judith Miller*, 397 F.3d 964 (D.C.Cir.) ("*In re Grand Jury Subpoena*"), *cert. denied*, 125 S.Ct. 2977 (2005), *reissued as amended*, 438 F.3d 1141 (D.C.Cir.2006), observed not long ago:

> [T]he executive branch possesses no special expertise that would justify judicial deference to prosecutors' judgments about the relative magnitude of First

Amendment interests. Assessing those interests traditionally falls within the competence of courts. Indeed, while the criminality of a leak and the government's decision to press charges might well indicate the leak's harmfulness—a central concern of the balancing test— once prosecutors commit to pursuing a case they naturally seek all useful evidence. Consistent with that adversarial role, the Federal Rules of Evidence assign to courts the function of neutral arbiter: "Preliminary questions concerning the qualification of a person to be a witness, *the existence of a privilege*, or the admissibility of evidence shall be determined by the court." Fed.R.Evid. 104(a) (emphasis added). Accordingly, just as courts determine the admissibility of hearsay or the balance between probative value and unfair prejudice under Rule 403, so with respect to this issue must courts weigh factors bearing on the privilege.

Moreover, in addition to these principles applicable to the judicial role in any evidentiary dispute, the dynamics of leak inquiries afford a particularly compelling reason for judicial scrutiny of prosecutorial judgments regarding a leak's harm and news value. Because leak cases typically require the government to investigate itself, if leaks reveal mistakes that high-level officials would have preferred to keep secret, the administration may pursue the source with excessive zeal, regardless of the leaked information's public value.

438 F.3d at 1175–76 (citations omitted).

In concluding that insofar as there is an applicable reporter's privilege, it has been

---

**3.** The government has repeatedly asserted that it has in fact exhausted alternative sources for obtaining the information it needs, but has not told us how it has done so. *See* Gov't Br. at 63–64; Affirmation of Patrick Fitzgerald, dated Nov. 19, 2004, at 5; *id.* at 5, n. 18; Letter of Patrick Fitzgerald to Solomon Watson, General Counsel, The New York Times Company, dated July 12, 2004, at 2.

overcome in this case, Judge Winter's opinion makes clear that the government's demonstration of "necessity" and "exhaustion" must, indeed, be made to the courts, not just the Attorney General.[4] The majority believes, wrongly in my view, that the standard has been satisfied in this case. But that is a far cry from the government's position that the Court's satisfaction is irrelevant.

The government relies primarily on *Branzburg* to support its view that the First Amendment provides journalists no judicially enforceable rights as against grand jury subpoenas. The government's reading of *Branzburg* is simply wrong. The *Branzburg* Court did not say that a court's role is limited to guarding against "extreme cases of prosecutorial bad faith," nor was the burden of its message that prosecutors can decide for themselves the propriety of grand jury subpoenas. Even in the context of its examination of First Amendment protections, it said that "the powers of the grand jury are not unlimited and are subject to the supervision of a judge," 408 U.S. at 688, 92 S.Ct. 2646, and that "this system is not impervious to control by the judiciary," *id.* at 698. The concluding portion of Justice White's opinion for the *Branzburg* Court noted that "[g]rand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." *Id.* at 708, 92 S.Ct. 2646. And, in affirming the judgment of the Supreme Judicial Court of Massachusetts in one of the cases before it, the Court noted that the duty of the reporter to testify on remand was "subject, of course, to the supervision of the presiding judge as to the

propriety, purposes, and scope of the grand jury inquiry and the pertinence of the probable testimony" under Massachusetts law. *Id.* at 709, 92 S.Ct. 2646 (internal quotation marks and citation omitted).

If there were any doubt on this point, Justice Powell, who cast the deciding vote for the Court, dispelled it. He referred, in his concurring opinion, to the "concluding portion of [Justice White's] opinion," *id.*, portions of which are quoted above. Justice Powell wrote:

> [T]he Court states that no harassment of newsmen will be tolerated. If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct.

*Id.* at 709–10, 92 S.Ct. 2646 (Powell, *J.*, concurring).

We have since written "that the Supreme Court's decision in [*Branzburg*] recognized the need [for the courts] to balance First Amendment values even where a reporter is asked to testify before a grand jury." *United States v. Burke,* 700 F.2d 70, 77 (2d Cir.) (citing *Baker v. F*

---

**4.** In this case, then-Deputy Attorney General James Comey. The Attorney General had re- cused himself.

& F Invs., 470 F.2d 778, 784–85 (2d Cir. 1972), cert. denied, 411 U.S. 966, 93 S.Ct. 2147 (1973)), cert. denied, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983); see also United States v. Cutler, 6 F.3d 67, 71 (2d Cir.1993) (noting the Branzburg Court's commentary that "[w]e do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." (quoting Branzburg, 408 U.S. at 708, 92 S.Ct. 2646)); Gonzales v. Nat'l Broad. Co., 194 F.3d 29, 34 (2d Cir.1998) (characterizing United States v. Cutler as "proceed[ing] on the assumption that, despite the nonconfidential nature of the information sought [from members of the media by a government subpoena in a criminal context], a qualified journalists' privilege applied, and the defendant had to show [to the district court] a sufficient need for the information to overcome the privilege"); cf. In re Grand Jury Subpoena, 438 F.3d at 1164 (Tatel, J., concurring in judgment) ("[G]iven that any witness—journalist or otherwise—may challenge [an 'unreasonable or oppressive'] subpoena, the [Branzburg] majority must have meant, at the very least, that the First Amendment demands a broader notion of 'harassment' for journalists than for other witnesses." (quoting Fed.R.Crim.P. 17(c)(2))).

Of course, Branzburg's core holding places serious, if poorly defined, limits on the First Amendment protections that reporters can claim in the grand jury context. But, as the majority implicitly acknowledges by treating them and the common law privilege separately, any limits on the constitutional protection imposed by Branzburg do not necessarily apply to the common law privilege under Federal Rule of Evidence 501. See In re Grand Jury Subpoena, 438 F.3d at 1160 (Henderson, J., concurring) ("[W]e are not bound by Branzburg's commentary on the state of the common law in 1972.");

id. at 1166 (Tatel, J., concurring in judgment) ("Given Branzburg's instruction that 'Congress has freedom to determine whether a statutory newsman's privilege is necessary and desirable and to fashion standards and rules as narrow or broad as deemed necessary to deal with the evil discerned,' Rule 501's [subsequent] delegation of congressional authority requires that we look anew at the 'necessity and desirability' of the reporter privilege—though from a common law perspective." (quoting Branzburg, 408 U.S. at 706, 92 S.Ct. 2646 (alterations incorporated))). The majority's primary focus on the common law privilege, as interpreted by Jaffee v. Redmond, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996), therefore appears to me to be appropriate.

## II.

To explain why I disagree with the majority's conclusion that we "need not decide whether a common law privilege exists because any such privilege would be overcome as a matter of law on the present facts," ante at 163, I must set forth in some detail why I think a privilege is applicable and what protection I think it affords.

It is self-evident that law enforcement cannot function unless prosecutors have the ability to obtain, coercively if necessary, relevant and material information. As the district court put it, "[i]t is axiomatic that, in seeking such testimony and evidence, the prosecutor acts on behalf of the public and in furtherance of the 'strong national interest in the effective enforcement of its criminal laws.' United States v. Davis, 767 F.2d 1025, 1035 (2d Cir.1985) (citations omitted)." N.Y. Times, 382 F.Supp.2d at 463.

The vital role the grand jury plays in the process is also indisputable.

[T]he grand jury, a body "deeply rooted in Anglo–American history" and guaranteed by the Fifth Amendment, *see United States v. Calandra*, 414 U.S. 338, 342–43, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), holds "broad powers" to collect evidence through judicially enforceable subpoenas. *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423–24, 103 S.Ct. 3133, 77 L.Ed.2d 743 (1983). "Without thorough and effective investigation, the grand jury would be unable either to ferret out crimes deserving of prosecution, or to screen out charges not warranting prosecution." *Id.* at 424, 103 S.Ct. 3133.

*In re Grand Jury Subpoena*, 438 F.3d at 1163 (Tatel, *J.*, concurring in judgment).

At the same time, it can no longer be controversial that to perform their critical function, journalists must be able to maintain the confidentiality of sources who seek so to be treated—reliably, if not absolutely in each and every case. As this Court recognized early on:

> Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis .... The deterrent effect such disclosure is likely to have upon future "undercover" investigative reporting ... threatens freedom of the press and the public's need to be informed. It thereby undermines values which traditionally have been protected by federal courts applying federal public policy to be followed in each case.

*Baker*, 470 F.2d at 782. As we later remarked, the *Baker* Court "grounded the qualified privilege [protecting journalists' sources] in a broader concern for the potential harm to 'paramount public interest in the maintenance of a vigorous, aggres-

sive and independent press capable of participating in robust, unfettered debate over controversial matters.'" *Nat'l Broad. Co.*, 194 F.3d at 33 (quoting *Baker*, 470 F.2d at 782). "The necessity for confidentiality [is] essential to fulfillment of the pivotal function of reporters to collect information for public dissemination." *Petroleum Prods.*, 680 F.2d at 8; *see also N.Y. Times*, 382 F.Supp.2d at 465, 469–71 (reviewing the evidence before the court with respect to need for these plaintiff's reporters in this case to be able to protect the identity of their sources in order to report effectively).

As Professor Alexander Bickel put it in the wake of *Branzburg*:

> Indispensable information comes in confidence from officeholders fearful of competitors, from informers operating at the edge of the law who are in danger of reprisal from criminal associates, from people afraid of the law and of government—sometimes rightly afraid, but as often from an excess of caution—and from men in all fields anxious not to incur censure for unorthodox or unpopular views .... Forcing reporters to divulge such confidences would dam the flow to the press, and through it to the people, of the most valuable sort of information: not the press release, not the handout, but the firsthand story based on the candid talk of a primary news source.... [T]he disclosure of reporters' confidences will abort the gathering and analysis of news, and thus, of course, restrain its dissemination. The reporter's access *is* the public's access.

Alexander Bickel, "Domesticated Disobedience," *The Morality of Consent* 84–85 (1975) (emphasis in original) (hereinafter *"The Morality of Consent"*).[5]

Beginning no later than our own opinion in *Baker*, *supra*, which was decided several

---

**5.** Professor Bickel represented amici on the losing side in *Branzburg*. He represented the successful petitioner in *"The Pentagon Papers Case"*, *N.Y. Times Co. v. United States*, 403

months after *Branzburg*, courts and legislatures throughout the country turned to this issue, many for the first time. They assessed the needs of effective law enforcement and effective news gathering, seeking to resolve as best they could the tension between them. Although the solutions crafted tended to be similar, they were not entirely uniform—one could hardly expect to find uniformity among thirty-one state legislatures [6] and myriad state and federal courts that established, or confirmed the existence of, a qualified privilege for journalists to protect the identity of their sources.[7] But they all-but-universally agreed that protection there must be. For the reasons set forth in great detail in both the seminal opinion of Judge Tatel in *In re Grand Jury Subpoena* and in the opinion of the district court here, I have no doubt that there has been developed in those thirty-four years federal common-law protection for journalists' sources under Federal Rule of Evidence 501 [8] as interpreted by *Jaffee*. The district court here succinctly outlined the factors in *Jaffee* a court should use in determining whether such a privilege exists:

(1) whether the asserted privilege would serve significant private interests; (2) whether the privilege would serve significant public interests; (3) whether those interests outweigh any evidentiary benefit that would result from rejection of the privilege proposed; and (4) whether the privilege has been widely recognized by the states. *See Jaffee*, 518 U.S. at 10–13, 116 S.Ct. 1923.

*N.Y. Times*, 382 F.Supp.2d at 494. A qualified journalists' privilege seems to me easily—even obviously—to meet each of those qualifications. The protection exists. It is palpable; it is ubiquitous; it is widely relied upon; it is an integral part of the way in which the American public is kept informed and therefore of the American democratic process.[9]

The precise words in which this journalist's privilege is stated differ from jurisdiction to jurisdiction. Our formulation of it in *Petroleum Products* quoted above is typical: "[D]isclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable

---

U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971). *See The Morality of Consent* 61 n.6 & 84 n.38.

**6.** The statutes are enumerated in the district court's opinion. *See N.Y. Times*, at 382 F.Supp.2d at 502 & n. 34. More recently, Connecticut enacted such a law. *See* Conn. Public Act No. 06–140 (June 6, 2006) (effective Oct. 1, 2006); *see also Lobbyist Argues against 'Shield' Laws for Media*, Tech. Daily, May 5, 2006; Christopher Keating & Elizabeth Hamilton, *A Deal at Last*, The Hartford Courant, May 4, 2006, at Al.

**7.** Judge Tatel referred to "the laws of forty-nine states and the District of Columbia, as well as federal courts and the federal government." *In re Grand Jury Subpoena*, 438 F.3d at 1172 (Tatel, *J.*, concurring in judgment).

**8.** Rule 501, adopted three years after *Branzburg*, in 1975, reads in pertinent part:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience.

**9.** Laws protecting confidential sources are hardly unique to the United States. *See, e.g., Goodwin v. U.K.*, 22 E.H.R.R. 123 (1996) (European Ct. of Human Rights) (interpreting Article X of the European Convention on Human Rights as requiring legal protection for press sources).

# 182

from other available sources." *Petroleum Prods.*, 680 F.2d at 7–8 (citing, *inter alia, Zerilli v. Smith,* 656 F.2d 705, 713–15 (D.C.Cir.1981) and *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 438 (10th Cir. 1977)).[10]

This qualified privilege has successfully accommodated the legitimate interests of law enforcement and the press for more than thirty years. That it serves the needs of law enforcement is attested to by the Department of Justice's guidelines themselves. As noted, they establish protection for journalists' sources in terms similar to the qualified privilege, albeit as a matter of self-restraint rather than legal obligation. If adhering to that standard hobbled law enforcement, it is difficult to imagine that the Department of Justice would have retained it—indeed, have expanded its coverage—over the course of more than three-and-a-half decades. And the flourishing state "shield" statutes indicate that similar state-law protection has not interfered with effective law enforce-

ment at the state level. That it works for the press, meanwhile, is demonstrated by "the dog that did not bark"[11]—the paucity (not to say absence) of cases in the many years between *Branzburg* and *In re Grand Jury Subpoena* in which reporters have indeed been ordered to disclose their confidential sources.

As we observed in *National Broadcasting Co.,* without requiring lawyers to seek alternative sources before permitting them to subpoena the press for the information, "it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims." *Nat'l Broad. Co.,* 194 F.3d at 35. But little of what reporters learn is obtained first hand. Most is, in a broad sense, told to them by others. Most is, therefore, "hearsay" when published. When the government seeks information in a reporter's possession, there is almost always someone other than the reporter

---

**10.** The "exhaustion" requirement—"not obtainable from other available sources"—harks back to what seems to be our first foray into this subject, *Garland v. Torre,* 259 F.2d 545 (2d Cir.1958), written by then-Sixth Circuit Judge Potter Stewart, sitting by designation. (Fourteen years later, by-then-Justice Stewart wrote the principal dissent in *Branzburg.*) This Court held, *inter alia,* that at that time there was no common law reporter's privilege. Indeed there was little upon which one might then have been found. We nonetheless noted, "While it is possible that the plaintiff could have learned the identity of the informant by further discovery proceedings directed to [the company of which the source was said to be an official], her reasonable efforts in that direction had met with singular lack of success." *Id.* at 551. In *Baker,* we said about *Torre:* "In view of the[ ] denials [by witnesses that they were Torre's source], the identity of Miss Torre's source became essential to the libel action: in the words of this Court, it 'went to the heart of the plaintiff's claim.' [*Torre,*] 259 F.2d at 550. Appellants in this

case [i.e., *Baker* ], however, have not demonstrated that the identity of [the reporter]'s confidential source is necessary, much less critical, to the maintenance of their civil rights action." *Baker,* 470 F.2d at 784.

The *Torre* case is also remembered for another reason: Ms. Torre famously served a short jail sentence for contempt rather than reveal the identity of her confidential source. *See* Nick Ravo, *Marie Torre, 72, TV Columnist Jailed for Protecting News Source* (obituary), N.Y. Times, Jan. 5, 1997, at Sec. 1, p. 24, Col. 5. A noteworthy aspect of the current litigation is that, because the source identifying information is in the hands of one or more third party telephone providers, the reporters here do not have the option of similarly responding to an order of the Court.

**11.** *See* A. Conan Doyle, *Silver Blaze,* in The Memoirs of Sherlock Holmes 58 (1948) (cited in Frederick Schauer, *Symposium: Defamation in Fiction: Liars, Novelists, and the Law of Defamation,* 51 Brook. L.Rev. 233, 241 & n.38 (1985)).

and somewhere other than the newsroom from whom or from which to obtain it. Under the qualified privilege, a lawyer— for the government or another party— engaged in litigation of any sort who thinks he or she needs information in a journalist's possession, usually can, and then, under the qualified privilege, therefore must, obtain it elsewhere. "[W]hen prosecuting crimes other than leaks (murder or embezzlement, say) the government, at least theoretically, can learn what reporters know by replicating their investigative efforts, e.g., speaking to the same witnesses and examining the same documents." *In re Grand Jury Subpoena*, 438 F.3d at 1174 (Tatel, *J.*, concurring in judgment). Except in those rare cases in which the reporter is a witness to a crime,[12] his or her testimony is therefore very rarely essential[13] and very rarely compelled.

### III.

The safeguard that has worked well over the years is, however, incomplete when it

is applied in "leak" inquiries such as those at issue here and in *In re Grand Jury Subpoena*. Before inquiring as to why, it is worth noting that the use of the term "leak" to identify unauthorized disclosures in this context may be unhelpful. It misleadingly suggests a system that is broken. Some unauthorized disclosures may be harmful indeed.[14] But others likely contribute to the general welfare[15]—frequently, I suspect, by improving the functioning of the very agencies or other entities from which they came. Secretive bureaucratic agencies, like hermetically sealed houses, often benefit from a breath of fresh air.[16] As Judge Tatel explained, "although suppression of some leaks is surely desirable ..., the public harm that would flow from undermining all source relationships would be immense." *In re Grand Jury Subpoena*, 438 F.3d at 1168 (Tatel, *J.*, concurring in judgment).

The "disorderly system," *The Morality of Consent* 80, by and large and until re-

---

**12.** As was alleged to be the case in each of the three cases that comprise *Branzburg*. See *Branzburg*, 408 U.S. at 668–72, 675–76, 92 S.Ct. 2646; *Branzburg v. Pound*, 461 S.W.2d 345 (1970) (the reporter personally observed the production of hashish and the sale and use of marijuana); *In re Pappas*, 358 Mass. 604, 266 N.E.2d 297 (1971) (the reporter witnessed criminal acts committed by members of the Black Panthers during a period of civil disorder in New Bedford, Massachusetts), *Caldwell v. United States*, 434 F.2d 1081 (9th Cir.1970) (reporter thought to have witnessed assassination threats against the President, mail fraud, attempt or conspiracy to assassinate the President, and civil disorder on the part of the Black Panthers).

**13.** *See The Morality of Consent* 84–85: "Obviously the occasions when a reporter will witness a so-called natural crime in confidence, and the occasions when he will find it conformable to his own ethical and moral standards to withhold information about such a crime are bound to be infinitesimally few."

**14.** "Leaks similar to the crime suspected [in *In re Grand Jury Subpoena*] (exposure of a covert agent) apparently caused the deaths of several CIA operatives in the late 1970s and early 1980s, including the agency's Athens station chief." *In re Grand Jury Subpoena*, 438 F.3d at 1173 (Tatel, *J.*, concurring in judgment).

**15.** "For example, assuming [Judith] Miller's prize-winning Osama bin Laden series caused no significant harm, I find it difficult to see how one could justify compelling her to disclose her sources, given the obvious benefit of alerting the public to then-underappreciated threats from al Qaeda." *Id.* at 1174.

**16.** "Sunlight is said to be the best of disinfectants; electric light the most efficient policeman." *Attributed to* Louis Brandeis, *Other People's Money* 62 (Nat'l Home Library Foundation ed.1933), *in Buckley v. Valeo*, 424 U.S. 1, 67, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).

cently, allowed government (and other entities jealous of their confidential information) to keep secrets the way most of us keep ours: by not disclosing them,[17] by employing people who will not disclose them, and by using other means to protect them. If the secret was kept, as we presume it usually was (though we obviously have no way to be sure), the secret was safe. If secrets escaped, the government could investigate within its own precincts to determine who was responsible. Once disclosed, however, for better or worse, the secret was a secret no longer, and that, for press and the public, was the end of the matter.

This is not to say, of course, that the government never declassifies material in the interest of public discourse, or that an editor never declines to publish matters of public interest because in his or her view, with or without consultation with the government, greater injury to the public will likely be occasioned by doing so. Professor Bickel, who described this "system," put it first and probably best:

> Not everything is fit to print. There is to be regard for at least probable factual accuracy, for danger to innocent lives, for human decencies, and even, if cautiously, for nonpartisan considerations of the national interest.... But I should add that as I conceive the contest established by the First Amendment, and as the Supreme Court of the United States appeared to conceive it in the Pentagon Papers case [*New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)], the presumptive duty of the press is to publish,

not to guard security or to be concerned with the morals of its sources.

*The Morality of Consent* 81.[18]

The result is a healthy adversarial tension between the government, which may seek to keep its secrets within the law irrespective of any legitimate interest the public may have in knowing them, and the press, which may endeavor to, but is usually not entitled to, obtain and disseminate that information.

> The government is entitled to keep things private and will attain as much privacy as it can get away with politically by guarding its privacy internally; but with few exceptions involving the highest probability of very grave consequences, it may not do so effectively. It is severely limited as to means, being restricted, by and large, to enforcing security at the source.... [T]he power to arrange security at the source, looked at in itself, is great, and if it were nowhere countervailed it would be frightening—is anyway, perhaps—since the law in no wise guarantees its prudent exercise or even effectively guards against its abuse. But there *is* a countervailing power. The press, by which is meant anybody, not only the institutionalized print and electronic press, can be prevented from publishing only in extreme and quite dire circumstances.

*Id.* at 79–80 (emphasis in original).

> [W]e are content, in the contest between press and government, with the pulling and hauling, because in it lies the optimal assurance of both privacy and free-

---

**17.** Within the limitations set by freedom of information and other disclosure laws, of course.

**18.** Although stories about the instances of secrets that the press has known and kept are published from time to time, *see, e.g.,* Scott Shane, *A History of Publishing, and Not Pub-*

*lishing, Secrets*, N.Y. Times, July 2, 2006, at Sec. 4., p. 4, Col. 1, it seems to me obvious that an unknowably large bulk of such secrets are not recounted in these stories precisely because in those instances the press chose to maintain the secrecy.

dom of information. Not full assurance of either, but maximum assurance of both.

Madison knew the secret of [it], indeed he invented it. The secret is the separation and balance of powers, men's ambition joined to the requirements of their office, so that they push those requirements to the limit, which in turn is set by the contrary requirements of another office, joined to the ambition of other men. This is not an arrangement whose justification is efficiency, logic, or clarity. Its justification is that it accommodates power to freedom and vice versa. It reconciles the irreconcilable.

.... [I]t is the contest that serves the interest of society as a whole, which is identified neither with the interest of the government alone nor of the press. The best resolution of this contest lies in an untidy accommodation; like democracy, in Churchill's aphorism, it is the worst possible solution, except for all the other ones. It leaves too much power in government, and too much in the institutionalized press,[19] too much power insufficiently diffused, indeed all too concentrated, both in government and in too few national press institutions, print and electronic. The accommodation works well only when there is forbearance and continence on both sides. It threatens to break down when the adversaries turn into enemies, when they break diplomatic relations with each other, gird for and wage war ....

*Id.* at 86–87.

## IV.

But as this litigation bears witness, the system is not altogether self-regulating. When the "untidy accommodation" be-

tween the press and the government breaks down, and the government seeks to use legal coercion against the press to identify its sources in and around government, the qualified reporter's privilege described in *Petroleum Products* and similar cases may be inadequate to restore the balance. In "leak" investigations, unlike in the typical situations with which courts have dealt over the years, the reporter is more than a third-party repository of information. He or she is likely an "eyewitness" to the crime, alleged crime, potential crime, or asserted impropriety. Once the prosecution has completed an internal investigation of some sort, therefore, it may be in a position to overcome the classic reporter's privilege because it may well be able to make "a clear and specific showing that the information [i.e., the identity of the source] is: highly material and relevant, necessary or critical to the maintenance of the claim [that someone known or unknown 'leaked' the information to a reporter], and not obtainable from other available sources." *Petroleum Prods.*, 680 F.2d at 7–8.

It seems clear to me that such a result does not strike the proper balance between the needs of law enforcement and of the press because, typically, it strikes no balance at all. The government can argue persuasively that the "leak" cannot be plugged without disclosure of the "leaker"/source by the recipient reporter.

Recognizing this, Judge Tatel suggested revising the traditional qualified privilege so that the court must also "weigh the public interest in compelling disclosure, measured by the harm the leak caused, against the public interest in newsgathering, measured by the leaked information's

---

**19.** Whether the changes in "the institutional press" in the age of the internet or the rise of global terrorism more than thirty years since Professor Bickel wrote would in any way change his analysis we can, of course, only guess.

value." *In re Grand Jury Subpoena,* 438 F.3d at 1175 (Tatel, *J.,* concurring in judgment).[20] This may in some circumstances involve a substantive determination of "whether [the reporters'] sources released information more harmful than newsworthy. If so, then the public interest in punishing the wrongdoers—and deterring future leaks—outweighs any burden on newsgathering, and no privilege covers the communication . . . ." *Id.* at 1178.

One could quibble with the precise wording that Judge Tatel employed. I think I might prefer something closer to the Senate bill's formulation: whether "nondisclosure of the information would be contrary to the public interest, taking into account both the public interest in compelling disclosure and the public interest in newsgathering and maintaining a free flow of information to citizens." Free Flow of Information Act, S. 2831, 109th Cong., § 4(b)(4) (2006). But without some such adjustment of the privilege in these circumstances, it threatens to become ineffective in accommodating the various interests at stake. And this is a common-law privilege capable of change and improvement in the hands of successive judges in successive cases as they seek to apply it to differing circumstances and changing conditions.

## V.

My disagreement with the majority opinion comes down to this: I do not think that "whatever standard is used, the privilege has been overcome as a matter of law on the facts before us." *Ante* at 170.

As I have explained, I think that overcoming the qualified privilege in the "leak" context requires a clear and specific show-

---

**20.** A bill introduced by Sen. Richard Lugar (R–Ind.), Chairman of the Senate Foreign Relations Committee, with Judiciary Committee Chairman Sen. Arlen Specter (R–Penn.), Sen. Christopher Dodd (D–Conn.), Sen. Lindsey Graham (R–S.C.) and Sen. Chuck Schumer (D–N.Y.)—The "Free Flow of Information Act of 2006"—is interesting in this regard. S. 2831, 109th Cong., § 4 (2006). Under it, a journalist's disclosure of, among other things, the identity of a confidential source

> may be ordered only if a court, after providing the journalist . . . notice and an opportunity to be heard, determines by clear and convincing evidence that,
>
> (1) the attorney for the United States has exhausted alternative sources of the information;
>
> (2) to the extent possible, the subpoena—
>
> > (A) avoids requiring production of a large volume of unpublished material; and
> >
> > (B) is limited to—
> >
> > > (i) the verification of published information; and
> > >
> > > (ii) surrounding circumstances relating to the accuracy of the published information;
>
> (3) the attorney for the United States has given reasonable and timely notice of a demand for documents;

> (4) *nondisclosure of the information would be contrary to the public interest, taking into account both the public interest in compelling disclosure and the public interest in newsgathering and maintaining a free flow of information to citizens;*
>
> (5) there are reasonable grounds, based on an alternative, independent source, to believe that a crime has occurred, and that the information sought is critical to the investigation or prosecution, particularly with respect to directly establishing guilt or innocence; and
>
> (6) the subpoena is not being used to obtain peripheral, nonessential, or speculative information.

*Id.* § 4(b) (emphasis added).

I quote the proposed language not, of course, because it is the law—obviously it is not and may never be—but because the use of the emphasized language indicates concern on the part of the Senators with precisely the problem that we address here—that the inadequacy of the classic three-part test in some circumstances requires an additional assessment of the public interest in deciding whether to compel disclosure.

ing (1) that the information being sought is necessary—"highly material and relevant, necessary or critical," *Petroleum Prods.,* 680 F.2d at 7–8; (2) that the information is "not obtainable from other available sources," *id;* and (3) that "nondisclosure of the information would be contrary to the public interest, taking into account both the public interest in compelling disclosure and the public interest in newsgathering and maintaining a free flow of information to citizens," Free Flow of Information Act, S. 2831, 109th Cong., § 4(b)(4) (2006). As noted, the government denies that it must prove to anyone other than itself that it has met any part of any test. Not surprisingly, then, the prosecutors' efforts to demonstrate that they have overcome the qualified privilege, before the district court and before us, have been limited at best.[21]

As for the first part of the inquiry, I do not see how a court can know whether the production of records divulging the identity of one or more confidential sources is necessary to a grand jury investigation without knowing what information the grand jury has and is looking for and why—much as the *In re Grand Jury Subpoena* district and appeals courts were presented with evidence of such details in the course of their deliberations. *See In re Grand Jury Subpoena,* 438 F.3d at

1180–82 (Tatel, *J.,* concurring in judgment) (discussing classified material provided to the court).

As for the second part of the inquiry, as already noted, the government does not so much as attempt to present any evidence showing that it has exhausted possible alternative means to identify the source or sources of the "leaks" other than by obtaining the telephone records it now seeks or, of course, by subpoenaing the reporters themselves. Its argument to us on this score reads:

> The district court also erred in concluding that the information sought by the subpoenas may have been available from other sources, or that the government had failed to establish that the information was not available. The Affirmation of the United States Attorney for the Northern District of Illinois, who was personally involved in conducting, and responsible for supervising, the ongoing grand jury investigation, stated that "the government had reasonably exhausted alternative investigative means," and that the Attorney General of the United States had authorized the issuance of the challenged subpoenas pursuant to the DOJ Guidelines. As the district court acknowledged, the DOJ Guidelines provided that subpoenas for

---

**21.** As previously mentioned, the government devotes just over six of the sixty-six pages in its brief to rebutting the plaintiff's assertion that the government has not met the burden it must carry to overcome their privilege. (The remainder of the brief contends that no privilege exists.) And the thrust of the government's argument to us in this regard is not that the district court should have granted judgment in its favor, as the majority would, but that summary judgment should not have been granted against it. *See* Gov't Br. at 61 ("[T]he district court ... erred in granting summary judgment to the plaintiff given that the evidence, at the very least, demonstrated the existence of disputed issues of fact material to the application of the privilege."); *id.* at

63 ("At a minimum, the evidence established the existence of genuine issues of material fact precluding summary judgment."); *id.* at 65–66 ("[T]he district court was obligated to resolve all ambiguities and draw al reasonable inferences in favor of the government and *against* the plaintiff in assessing the plaintiff's motion for summary judgment .... The evidence before the district court was sufficient, even in the absence of disclosures of evidence protected by grand jury secrecy, to support a finding that any applicable privilege had been overcome. At the very least, the evidence established the existence of disputed issues of fact precluding summary judgment in favor of the plaintiff." (citation omitted; emphasis in original)).

telephone records of reporters could only be authorized based upon a finding by the Attorney General that all reasonable alternative sources had been exhausted.

Gov't Br. at 63 (citations omitted). Instead of seeking to meet the test for overcoming the qualified privilege, the government asks us to take its word.

My colleagues nevertheless conclude that the government has demonstrated exhaustion. According to them, "[t]here is simply no substitute for the evidence [the reporters] have," because the "evidence as to the relationship of [the reporters'] source(s) and the leaks themselves to the informing of the targets is critical to the present investigation." *Ante* at 170. To the extent the majority is saying that the government has exhausted available alternatives because the identity of the reporters' sources is "critical" information, this appears to confuse the requirement that evidence be *important* with the requirement that it be *otherwise unavailable*. However critical the identity of the reporters' confidential sources may be, it is known to at least one person besides the reporters: the source or sources themselves. Because the government has offered *no* evidence, other than the conclusory assertions of its own agents, that it has sought to discover this information from anybody other than the reporters, I do not see how we can conclude that it has made "a clear and specific showing" that the information is "not obtainable from other available sources." *Petroleum Prods.*, 680 F.2d at 8; *ante* at 169–70.[22]

The third, "public interest," part of the test, too, was not addressed directly by the government.[23] Here, its failure to do so is

---

**22.** The majority asserts in footnote [5] of its opinion that "ascertaining the reporters' knowledge of the identity of their sources and of the events leading to the disclosure to the targets of the imminent asset freezes/searches is clearly essential to an investigation into the alerting of those targets." *Id.* It also asserts that such knowledge "is not obtainable from other sources" because "even a full confession by the leaker would leave the record incomplete as to the facts of, and reasons for, the alerting of the targets." *Id.* These arguments do not seem to me to relate to the discovery request at issue in this case, which is for telephone records that would no more than disclose the identity of the journalists' sources and the dates and times of contact.

**23.** The majority refers to the reporters' disclosure of the government's plans to freeze the assets "and/or" search the foundations' offices. *Ante* at 170 This characterization of the government's allegations does not seem to me to be supported by the record. As I read it, the evidence suggests only that Judith Miller, who was covering the HLF story, was told of the government's plan to freeze HLF's assets—*not* "and/or" conduct an FBI search. *See* Aff. of Judith Miller, dated Nov. 12, 2004, at ¶ 9. She then "telephoned a HLF representative seeking comment on the government's intent *to block HLF's assets*" *Id.* at ¶ 10 (emphasis added). Miller's December 4, 2001 published story referred to the imminent freezing of the foundation's assets but did not mention any search. Judith Miller, *U.S. to Block Assets It Says Help Finance Hamas Killers*, N.Y. Times, Dec. 4, 2001, at A9.

Reporter Shenon similarly says in his affidavit that on December 13, 2001, he "recall[s] contacting GRF [the 'Global Relief Foundation'] for the purposes of seeking comment on the government's apparent intent to freeze assets." Aff. of Philip Shenon, dated Nov. 9, 2004, at ¶ 5. He does not mention an FBI search of GRF, which he apparently did not report upon until after it happened. Philip Shenon, *A Nation Challenged: The Money Trail*, N.Y. Times, Dec. 15, 2001, at B6.

Nothing in the sparse record suggests to me that either reporter told HLF about, or even themselves knew about, an FBI search before it happened. Nor does the government appear to contend, let alone seek to establish, that Shenon and Miller knew about imminent raids. Instead, it asserts only that the reporters disclosed the impending asset freezes and that as a result the foundations thought an FBI search to be likely.

There seems to me to be a significant difference between informing the target of an in-

understandable inasmuch as the requirement was not explicitly a part of our case law at the time this matter was litigated in the district court. The majority and the government seem to be of the view, nonetheless, that the disclosure in this case was of great consequence and that protection of the leaker's identity here is of little value to the public in "maintaining a free flow of information." If that is so, it would follow that the balance with respect to this factor would tilt decidedly on the side of compelling disclosure. I, for one, see no way that we can know based on the current record.

The information that the assets of HLF and GRF were being frozen was given to reporter Miller sometime before December 3, 2001, and to reporter Shenon sometime before December 13, 2001. The searches of the two organizations' offices took place on the mornings of December 4 and 14, respectively. It was not until August 7, 2002, that the government approached the *Times* seeking its cooperation with respect to this matter and its consent to review the reporters' telephone records. The *Times* declined. There was no further contact between the government and the *Times* on this matter until July 12, 2004, nearly two years later. After the flurry of communications between the parties that followed, the plaintiff began this litigation on September 29, 2004. It culminated in the district court's decision of February 24, 2005. The government's appeal has been pending in this Court since May 31, 2005. No request for expedition has been made. Indeed, at the government's September 9, 2005, request, it received a one-month extension to file its appellate brief.

There is, of course, nothing inherently wrong with the government proceeding deliberately. To the contrary, it may be laudably consistent with the goal of its own guidelines to protect the newsgathering process when it can. Nonetheless, the elapsed four and a half years does fairly raise the question of just how significant the leaks were or are considered to be by the government. I thus do not see how we can possibly address the question posed by the third part of the qualified immunity test—a balancing of interests—without the government's demonstration as to precisely what its interests are.

I do not mean to suggest that the government could not have made an adequate showing on each of the three parts of the qualified privilege, much as it apparently did in *In re Grand Jury Subpoena*. Nor do I mean to imply that it does not need the information it seeks, has not in fact exhausted alternative sources, or that finding, silencing, and seeking to prosecute or punish the sources of the material that was disclosed is not crucial. I have no basis on which to dismiss out of hand the prosecutors' assertion that they did make a sufficient showing, at least on the first two counts, to the then-Deputy Attorney General. But the government was also required to make such a demonstration to the district court, subject of course to our review. It has declined to do so. For that reason, concluding that the judgment of the district court must be affirmed, I respectfully dissent.

---

vestigation about a freeze of its assets, presumably a white collar operation, and an FBI raid, knowledge of which could place FBI agents in danger of life and limb. It may be that a seasoned reporter would know that a

tip as to an asset freeze is tantamount to a tip as to an FBI search. I have no idea whether that is true, but on the current record, it is no more than conjecture.